551 A.2d 143

**In re ADOPTION NO. 09598 IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY.**

No. 344, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Jan. 4, 1989.

512

**514**

Beatrix D.M. Whitehall, Upper Marlboro, for appellant.

Donna R. Heller, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellee, Prince George's County Dept. of Social Services.

Mary T. Griffin of Riverdale, for appellee, Brandon.

Argued before GARRITY, BLOOM and ROBERT M. BELL, JJ.

GARRITY, Judge.

In this matter, we shall track the statutory considerations necessary to the termination of parental rights. This case represents an example of massive social service efforts to stabilize and improve the family situation of four children who were in serious need of assistance due to neglect and lack of parental care.

In this particular chapter of failed parental responsibility, the appellant, Earl L., currently twenty-six years-of-age, appeals a judgment of the Circuit Court for Prince George's County (Perry, J.) granting the petition of the Prince George's County Department of Social Services for termination of parental rights and giving the Department guardianship over his son, Brandon, with the right of the Department to consent to adoption.

The appellant asks us to review (1) whether the circuit court erred when it applied the provisions of Md.Fam.Law Code Ann. § 5–313 in determining, on November 10, 1987, that it was in Brandon's best interest to terminate the appellant's parental rights and (2) whether the circuit court

erred when, after determining that it was in Brandon's best interest to terminate the appellant's parental rights, it ordered guardianship with the right to consent to adoption instead of long-term foster care. The child's mother, Ms. W., did not appeal the court's determination to terminate her parental rights to Brandon.

## Factual Background

To facilitate our review of this matter in accordance with statutory considerations, we shall be detailed in our presentation.

Brandon was born to the appellant and Ms. W. on July 28, 1982. For the first three months of his life, Brandon lived with his parents and a half-brother, Lamont, in an apartment in Forestville, Maryland. In October 1982, Ms. W. took Brandon and Lamont to stay with the T.'s in the District of Columbia. Mrs. T. was a woman Ms. W. had met at her church and with whom she had developed a close relationship. In early January 1983, Ms. W., Lamont and Brandon returned to live with the appellant in the Forestville apartment.

On January 31, 1983, Ms. W. called the Prince George's County Department of Social Services about placing her children in foster care. Ms. W. told Carol Kramer, a protective services worker, that she had been physically abused by the appellant, but that he had not hurt the children. When Ms. Kramer met with Ms. W., Ms. W. no longer wanted to place the children with the Department. A few days later, Ms. Kramer visited the appellant and Ms. W. at the apartment and provided referrals for services after the appellant admitted he had hit Ms. W.

On February 4, 1983, Ms. W. called Ms. Kramer and reported that she and the appellant had been involved in another altercation. After Ms. Kramer met Ms. W. at the apartment, Ms. W. agreed to have the children placed in foster care. Ms. Kramer removed the children at that time and filed a Child in Need of Assistance (CINA) petition with

the Circuit Court for Prince George's County. At the hearing on the petition, however, Lamont and Brandon were returned to the care and custody of Ms. W. The appellant did not attend the hearing.

The day after the hearing, Ms. W. and the appellant again separated. Ms. W. again took Brandon and Lamont to the T.'s home in the District of Columbia. After a brief reconciliation between the appellant and Ms. W., Ms. W. and the two boys returned to the T.'s home for a few weeks in April 1983. For a six-week period in April and May 1983, Ms. W. and the children lived in various District of Columbia shelters. During this period, Lamont had not been attending school and Brandon was behind in his immunization shots. On May 23, 1983, Ms. W.'s third child, Kelly was born three months prematurely.[1] At approximately this time, Ms. W. and the children moved back to the Forestville apartment with the appellant.

In an interview with Ms. W. and the appellant, neither parent would consent to placing the children in foster care. Consequently, the Department petitioned the circuit court for a review hearing. The parents were subpoenaed to appear and were informed that transportation would be provided. When neither parent appeared, the court ordered writs of attachment for Mrs. W., Lamont and Brandon. They were located in a Montgomery County shelter. On June 2, 1983, the two boys were adjudicated CINA and were committed to the Department for placement in foster care.

In late July 1983, Ms. W. asked that Lamont and Brandon be removed from their original foster home and placed with the T.'s. Shortly thereafter, Lamont and Brandon were placed in the T.'s home in the District of Columbia and have lived there continuously since that day.

During the next three years, the appellant and Ms. W. conducted a sporadic relationship with each other. Another son, O'Keith, was born in the District of Columbia in 1985;

---

1. Kelly died as a result of congenital heart problems.

Ms. W., however, was persuaded by social workers to put the child into foster care, where he remains. In 1987, the couple, who remained unmarried, had a fourth child, Earl, Jr. That child, who was initially placed with the District of Columbia Department of Human Services (DCDHS), now lives with Mr. L.

On June 11, 1986, the Department filed a petition for guardianship of Brandon and Lamont with the right to consent to adoption. During a five-day trial, in addition to establishing Mr. L.'s immature, violent, and neglectful pattern of conduct, representatives from the Department testified that the appellant had rarely visited Brandon, had switched jobs frequently, and had failed to secure a place for the children to live.

## *Discussion*

### I.

The appellant argues that the chancellor erred by improperly applying the statutory criteria of Md.Fam.Law Code Ann. § 5–313 in determining that it was in Brandon's best interest to terminate the appellant's parental rights.

Section 5–313(a) provides, in pertinent part, as follows:

> A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child and that ... (2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance....

As to the circumstances of this case, we construe Section 5–313(a) as unambiguously empowering a court to grant a decree of guardianship without the consent of a natural parent if the court finds by clear and convincing evidence that (1) it is in the best interest of the child to terminate the natural parent's rights as to the child and (2) in a prior juvenile proceeding the child has been adjudicated a child in

need of assistance.[2] Section 5–313 requires that the court determine whether it is in the best interest of the child to terminate the natural parent's rights as to the child by making findings of fact as to each factor of required consideration listed under Section 5–313(c) and (d). *See Washington County Dept. of Social Services v. Clark*, 296 Md. 190, 198–99, 461 A.2d 1077 (1983).

 Our scope of review in the present case is delineated by the Maryland Rules. In particular, Md. Rule 8–131(c) mandates that:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Our present task, therefore, is to review the evidence presented below to determine whether the chancellor's findings were clearly erroneous. *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 353–54, 517 A.2d 1122 (1986). Accordingly, our function, in reviewing Chancellor Perry's findings, is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the chancellor's determination that it would be in the best interest of Brandon to terminate the parental rights of his natural father. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court. *Id.* at 354, 517 A.2d 1122.

### A. *Prior CINA Finding*

The appellant apparently does not dispute that Brandon had been adjudicated a child in need of assistance in a prior

---

**2.** Due process considerations require that the clear and convincing evidence standard be employed in termination proceedings. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

juvenile proceeding. Indeed, our review of the record indicates that Brandon was adjudicated a CINA at a hearing held on June 2, 1983.

### B. *Findings Under Section 5-313(c)*

■ Section 5-313(c) details various factors a court must consider in determining whether it is in the best interest of the child to terminate a natural parent's rights. Specifically, the subsection provides:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

We shall review the chancellor's findings of fact as to each of the foregoing criteria.

### Services Offered to Facilitate Reunion

The chancellor found that social services in the form of counseling, medical care, financial assistance, and tenant assistance had been constantly offered since Brandon was placed in foster care but were not accepted by the appellant. Specifically, the chancellor found that the appellant failed to present himself for counseling, did not fill out forms necessary to continue medical and financial assistance, and failed to follow through with assistance for housing.

The services offered by the Department included psychiatric therapy, a parenting skills class, medical assistance, public assistance, and referral to the Tenant Assistance Program in the District of Columbia, with which it cooperated.

When the case was first opened in early 1983, the Department offered the appellant referrals for counseling to address his violent behavior towards Ms. W. The appellant did not attend counseling until March of 1984, when he attended a few sessions with Ms. W. and her therapist, Ms. Marian McCarthy. At that time Ms. McCarthy referred the appellant for psychiatric treatment, but he did not attend.

In September 1984, the appellant expressed to Ms. Elizabeth Emond, a foster care worker, his desire to work with the Department to have his children returned. Ms. Emond arranged for the appellant and Ms. W. to begin counseling in the District of Columbia. The appellant, however, did not attend counseling until the court ordered him to participate on October 22, 1984. Subsequently, the appellant attended only a few sessions before concluding that he did not need counseling.

Circuit Court Mental Hygiene (CCMH) evaluations [3] were scheduled in March and July of 1983, April and May of 1985, and January and July of 1987. The appellant failed to keep at least half of these appointments.

The Department offered the appellant transportation to CCMH appointments, court hearings, and other appointments. Apparently, the appellant utilized this service only a few times. He reportedly blamed his failure to attend many of the CCMH appointments on the lack of transportation.

The District of Columbia Department of Human Services (DCDHS) became involved with the appellant and Ms. W. when that agency was asked to investigate the care of O'Keith, who was born in the District of Columbia on November 23, 1984. DCDHS placed O'Keith in foster care in June 1985, when the child was determined to be at risk because Ms. W. and the appellant had failed to provide him with health care or a suitable environment.

In January 1987, Ms. W. gave birth to Earl, Jr., the couple's fourth child, who was placed in the care and custody of DCDHS. The appellant obtained custody of Earl, Jr., in April 1987, but did not take the infant to a scheduled diagnostic evaluation. DCDHS was unable to locate the appellant, or Earl, Jr. until a public assistance worker called the agency in June of 1987 and stated that the appellant and Earl, Jr., had arrived at her office home-

---

3. These are court ordered psychological evaluations.

less and without food. Eventually, DCDHS was able to secure public assistance for the appellant. The appellant testified, however, that public assistance for Earl, Jr. was terminated because he failed to submit the proper forms.

## Social Service Agreements

Chancellor Perry found that "[s]everal service agreements were executed by the mother and father. None of them were fulfilled." She further determined that, contrary to their agreement, the parents had not obtained suitable housing for over four years.

The record before us indicates that the appellant entered into four service agreements with the Department.[4] Generally, in each of the agreements, the appellant agreed to attend appointments such as counseling sessions or CCMH evaluations, maintain regular visitation with Brandon, obtain adequate housing, work full-time, and maintain contact with his social worker.

The evidence unequivocally demonstrates that the appellant did not fulfill his obligations under the agreements. Indeed, he stated that counseling was a "waste of [his] time" and attended only a few sessions. He failed to honor his agreement to maintain regular visitation with Brandon or to look for suitable housing. During the four and one-half years the Department had custody of Brandon, the appellant's contact with social workers was, at best, sporadic and infrequent.

In the service agreements, the Department generally agreed to provide foster care services to Brandon, schedule various appointments, inform the appellant about his child and coordinate visits, and provide transportation.

Our review of the record leads us to conclude that the Department fulfilled, or made good faith efforts to fulfill, its obligations under the agreements. The Department

---

4. We note that only one of these agreements also included Ms. W.

scheduled appointments for public assistance, medical care, counseling and evaluations, and provided transportation whenever the appellant requested. To the extent possible, the Department informed the appellant about Brandon and attempted to maintain contact with the appellant through letters, phone calls, and communications with social workers in the District of Columbia. As a matter of fact, the appellant testified during the guardianship proceedings that the Department had never failed to provide services he had requested.

### Emotional Ties of Child

In describing the various relationships in Brandon's life, the chancellor found that Brandon and his half-brother, Lamont, were very close, that Brandon referred to his foster mother as "Granny" and her grandson as his "cousin," and that although the appellant appeared to love Brandon, he felt that an occasional visit was sufficient to satisfy his parental duty. The court found that the T.'s wanted to adopt both children and that Lamont worried about being separated from Brandon, who also lived with the T.'s.

The record reflects that Brandon has strong feelings toward, and emotional ties with, his half-brother, Lamont. Brandon and Lamont have never been separated.

Evidence further established that Brandon has strong emotional ties with the T.'s. Brandon first came to live with the T.'s in October 1982 when he was three months old and stayed there with his mother and Lamont until he was six months old. Since August 1983, the T.'s have continuously provided a home for Brandon. Their care of Brandon is in sharp contrast to the sporadic visits of the appellant.

### Adjustments of Child

Chancellor Perry found that Brandon had adjusted well to his community, school and home. She further found Bran-

don to be secure, healthy and well-adjusted, and that he presented no behavioral problems.

During the guardianship proceedings, Mrs. T. testified that Brandon and Lamont had lived with her and her husband in the same house in the District of Columbia since August 1983. Mrs. T. further testified that she took Brandon to church, to medical and other necessary appointments, that she conducted bible classes in her home which Brandon attended, and that Brandon was part of the neighborhood.

Brandon began kindergarten in the fall of 1987. The child's teacher described him as well-adjusted and happy, "a good friend to his classmates," and an eager student. Mrs. T. is involved with the PTA at the school.

### Efforts of the Natural Parents

The chancellor found that neither parent made the necessary adjustments in their living circumstances, conduct, or conditions to allow their custody of Brandon to be in his best interest.

As previously related, the record reflects that the appellant's visits to Brandon were infrequent and that he, on occasion, did not contact his son for months at a time. In particular, the appellant moved to Spotsylvania, Virginia in March 1986, and did not contact the Department, the T.'s, or Brandon for at least four or five months. Mrs. T., Brandon's foster mother, testified at the guardianship trial that sometimes months would go by without the appellant visiting Brandon.

Although the chancellor did not make specific findings with regard to the appellant's payment of a reasonable part of Brandon's care and maintenance, a foster care worker testified that on February 25, 1985, the appellant had agreed and was ordered to make child support payments of $15 per month. On October 6, 1987, however, he was a

party in a contempt proceeding for failure to pay child support arrearages totalling $375.

The chancellor found that for extended periods of time, social service workers were unable to locate either the appellant or Ms. W. During the guardianship trial, a Department foster care worker testified that despite attempts to contact the appellant, Brandon was in foster care for over a year before she ever met the appellant. The Department sent numerous letters to the appellant. The appellant acknowledged that, although he had received the letters, he intentionally ignored them.

The chancellor found it unlikely that additional services would bring about a lasting parental adjustment so that Brandon could be returned to his natural parents. During the guardianship hearing, the appellant testified that he never requested any social services because he did not need the Department's assistance to take care of his children. Finally, the appellant admitted to committing domestic violence against Ms. W., but denied he needed therapy because "every person has the right to defend himself."

*Services Offered to the Natural Parents*

We have previously discussed the services of agencies and professionals in addition to those provided by the Prince George's County Department of Social Services. See our discussion of services offered to facilitate reunion.

Based upon our review, we hold that Chancellor Perry's findings of fact made pursuant to the criteria contained in Section 5–313(c) were supported by legally sufficient evidence.

### C. *Findings Under Section 5–313(d)*

Section 5–313(d)(1) contains additional conditions or acts which a court generally must consider in determining whether it is in the best interest of the child to terminate a

natural parent's rights as to the child. In particular, this subsection provides as follows:

In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family; or

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able.

We note that this subsection is satisfied if the court finds the existence of any *one* of the continuing or serious conditions or acts detailed above.

In the case *sub judice*, Chancellor Perry addressed the statutory condition contained in Section 5–313(d)(1)(iii) when she found that "neither parent is reliable and neither can be held accountable for providing food, clothing, shelter, education or any other care or control necessary for the physical, mental or emotional health of the children." The chancellor opined that "[p]rior to foster care, the children lived in incredible squalor in a high crime and drug area, and were frequently left alone," and that there was no guarantee that the situation would not occur again if the children were returned to the parents. The chancellor also concluded that, "[w]hile Mr. L. verbalizes his intentions, he never follows through."

We find no evidence in the record to indicate that the appellant was physically or mentally disabled so as to prevent his obtaining full-time employment. Despite his inability to adequately provide for his children, however, the appellant testified during the guardianship hearing that he did not need public assistance.

 Based upon our review of the evidence as previously related, we hold that Chancellor Perry's findings of fact made pursuant to Section 5–313(d)(1)(iii) were supported by legally sufficient evidence.[5]

## II.

 The appellant further contends that the chancellor erred when, after determining that it was in Brandon's best interest to terminate the appellant's parental rights, she ordered guardianship with the right to consent to adoption instead of long-term foster care.

In the case *sub judice,* we hold that Chancellor Perry properly determined that it was in Brandon's best interest to terminate the appellant's parental rights. The effect of the decree was that it terminated the appellant's rights, duties, and obligations toward Brandon. Family Law § 5–317(c)(1).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES.

---

**5.** The appellant also argues that the chancellor's findings of fact violated his right to equal protection of the law. Apparently, the appellant does not argue that Section 5–313 contains constitutionally impermissible factors, but that the chancellor impermissibly relied upon his poverty in making her decision. We have held, however, that the chancellor's determination was clearly supported by sufficient evidence. The record reflects that Chancellor Perry's review of the evidence was painstakingly thorough, sensitive and fair. Indeed, the application of any improper consideration by her is starkly absent. Neither wealth nor poverty serve to excuse an attitude of irresponsibility and neglect.