567 A.2d 139

**In re ADOPTION NO. 2428 IN THE CIRCUIT COURT FOR WASHINGTON COUNTY.**

**No. 410, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Dec. 21, 1989.

Certiorari Denied Feb. 23, 1990.

134

Katherine J. Jones (Elizabeth Renuart, on the brief), Frederick County, for appellant.

Cathy A. Dryden, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Mark J. Davis, Asst. Atty. Gen., on the brief for appellee, Washington County Dept. of Social Services) Baltimore (Cecilia B. Paizs and Meyers, Young & Grove, on the brief for Intervenor Grandmother), Hagerstown, for appellees.

Argued before WILNER, ALPERT and CATHELL, JJ.

ALPERT, Judge.

The Washington County Department of Social Services ("the Department") filed a Petition for Guardianship With the Right to Consent to Adoption and/or Long–Term Care Short of Adoption over James F., the 2½–year–old son of Kimberly P., who was a 15–year–old "Child in Need of Assistance" at the time the Petition was filed. James, through counsel, filed an answer and Kimberly filed her notice of objection. Aileen F., natural mother of Kimberly, filed a motion to intervene which was granted. James's natural father consented to the Petition. At trial, the Circuit Court for Washington County (D. Moylan, J.) granted the Department's request for relief.

On appeal, Kimberly raises the following issues:

I. Whether the court erred as a matter of law by finding that the required factors contained at Md. Fam.Law Code Ann. § 5–313(d)(1) had been satisfied.

II. Whether the court violated appellant's constitutional right to the equal protection of the law by defining disability to include minority.

III. Whether the court erred in failing to make required findings of fact, in failing to support some of its conclusions, and in failing to weigh these factors

appropriately when it terminated appellant's parental rights.

Because we conclude that the substantial merits of the case will not be determined by affirming, reversing, or modifying the judgment, we shall remand to the trial court for the purpose of having that court clarify its findings of fact where necessary, make additional findings of fact, and restate its conclusions of law as necessary. Md.Rule 8–604(d).

*Facts and Proceedings*

James F. was born to Kimberly P. (appellant) on December 11, 1986. Appellant, born April 25, 1973, was 13 years old when James was born. The two lived with appellant's mother, Aileen F., until April 30, 1987, when James and appellant were adjudicated Children In Need of Assistance.

The Washington County Department of Social Services placed appellant and her son in a foster home on June 15, 1987. They remained there until July 13, 1987, at which time appellant and child were moved to another foster home after an argument between appellant and her foster mother. They remained there until the Department could schedule an emergency hearing.

At the hearing on July 23, 1987, the court placed appellant at the Jackson Unit of the Thomas B. Finan Center, a structured shelter care facility in Cumberland, Maryland, over her objection. The court committed James to the Department for foster care placement. The Department provided transportation for James to the Finan Center to visit with appellant on four occasions. On October 8, 1987, appellant was placed at the Shining Tree Children's Home in Washington County, as there was no foster home available or group home that would take both appellant and her son. On that date, appellant's social worker met with Shining Tree officials to discuss services to be provided to appellant concerning James. The social worker also set up a weekly visitation schedule.

On December 14, 1987, appellant entered into a service agreement with the Department. The purported goal of the service agreement was the reunification of appellant and her son.

At a review hearing on January 7, 1988, the court ordered the Department and the other professionals involved with the family to form a team to coordinate the services offered to the family. This order was the result of the concerns raised by appellant and her mother that many of the different professionals were requesting different things from them. On May 8th, James was placed in yet another foster home. On May 27, 1988, appellant and the Department signed a revised service agreement in hopes of appellant assuming gradual responsibility for James's care.

After James's placement in the most recent foster home, appellant decided that she did not want to visit James there or to be placed there. Instead, she wanted to return to her mother's home. The Department decided to allow James visits with appellant in her mother's home. In July of 1988, James was moved to his current foster home, where he resides with Mr. and Mrs. Tunic.

On July 12, 1988, appellant agreed to sign a consent to guardianship, stating that she "was tired of being treated like an adult," and that she wanted "to be a 15 year old." Appellant revoked this consent on August 4, 1988.

In August or September, 1988, appellant was placed in the home of her mother. James did not join her. Appellant was removed from her mother's home on October 6, 1988, and returned to the Shining Tree program. The only explanation of this removal came from appellant, who said she was refusing to get up and go to school because her classmates were calling her names, and from her mother, who said "everything just blew up. Kim wouldn't go to school."

The Department filed the petition for guardianship on August 23, 1988. Dr. Albert Powell, a psychiatrist, evaluated appellant and James in preparation for the guardianship

hearing scheduled for December 19, 1988. Dr. Powell recommended that James be placed for adoption.

## I.

### A.

In order to terminate a natural parent's rights to a child, the court must find by clear and convincing evidence that termination is in the child's best interest and that certain factors exist. Md.Fam.Law Code Ann. § 5–313(a). Where a child has been declared a Child in Need of Assistance (CINA), as in the case *sub judice,* the court must *consider* "whether any of the following continuing or serious conditions or acts" set forth in § 5–313(d)(1) exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family; or

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able.

■ Appellant contends that the court committed legal error in finding that her minority constituted a "disability" and, therefore, satisfied the statutory requirement of § 5–313(d)(1)(i). We agree. Disability is defined in § 5–301(c) for purposes of the guardianship and adoption statute. This definition lists mental disorders, mental retardation, chronic alcoholism, and drug addiction. Age is not included in the definition. Therefore, appellant's minority does not support a finding under § 5–313(d)(1)(i). (Given this holding, we need not consider issue "II".)

### B.

Appellee does not contest the fact that minority is not a disability under the statute. It contends, rather, that the

lower court's decision should be upheld because clear and convincing evidence exists which supports a finding under § 5–313(d)(1)(iii).

Appellee argues that the trial court acknowledged the extensive evidence supporting a finding under § 5–313(d)(1)(iii) that Kimberly could not be counted on to provide the care and control necessary for James's physical, mental, and emotional health. It points out that the court noted her inability to be "dependable seven days a week, month in and month out"; her consistent inability "to care for the immediate and ongoing physical and psychological needs of the child for long and extended periods of time"; and her inability to provide "the food and clothing and shelter and education or other care or control necessary for the child's physical, mental and emotional health."

Appellant quite correctly recognizes that "in order to terminate Kimberly's natural rights over her child, the court must find by clear and convincing evidence that termination is in James's best interests and that certain factors exist." She further contends that, additionally, "the court must find that at least one of the serious conditions or acts contained in § 5–313(d)(1) exists" and that "if it does not find that one of these three factors exists, the Section is not satisfied and cannot support a termination of parental rights." We disagree with the latter contention.[1] Even if

---

1. This court has noted that this subsection is "satisfied" if the court finds the existence of any one of the continuing or serious conditions or acts detailed above. *In Re Adoption No. 09598,* 77 Md.App. 511, 551 A.2d 143 (1989). In that case we also opined that:

 Section 5–313 requires that the court determine whether it is in the best interest of the child to terminate the natural parent's rights as to the child by making findings of fact as to each factor of required consideration listed under Section 5–313(c) and (d).

 *Id.* at 518, 551 A.2d 143. While trial courts are constrained to make findings of fact as to each applicable factor, including the non-existence of facts where appropriate, in determining "the best interests of the child" under § 5–313, all applicable factors under each subsection must be considered together. Therefore, the inapplicability of the § 5–313(d)(1) factors would not, *per se,* preclude termination where consideration of the remaining factors persuaded the trier of fact that

appellant were correct, however, in light of the trial judge's factfinding pursuant to § 5–313(d)(1)(iii), the contention becomes irrelevant.

 We believe that the physical and financial ability referred to in subsection (iii) relates to the natural parents' repeated failure to provide the child with "adequate food, clothing, shelter, and education" and not to "other care or control necessary for the child's physical, mental, or emotional health." In regard to the child's physical, mental, and emotional health, Judge Moylan observed:

> The reason why I'm going to terminate the parental rights is really based on the evidence. Probably the single most important factor in this case is time. Time doesn't wait for anybody and it isn't going to with this child. The child is now two years old. According to Dr. Powell, the child is not damaged emotionally in any way and the child is very resilient. The relationship that the child has been able to form in the foster home isn't simply because these foster parents are super people or because they have a mother or father or something like that, it is because the capacity to do that is in the child. If the child does not get placed in a permanent situation soon, and soon, when you're talking about a child who is just about twenty four months old, you're talking in terms of months, and if that would not happen, the child could lose the capacity to form those types of relationships forever, for the rest of the child's life. That's why it's so important.
>
> . . . .
>
> At thirteen years of age, you really had not matured to the point or at a stage of emotional development that you really knew how to provide—I guess probably the most

---

termination of parental rights was necessary to insure "the best interests of the child." Here, the trial judge apparently recognized that while the child's best interests would be served by uniting him with his natural mother in a "permanent situation soon," that time had run out. See Judge Moylan's findings, *infra*.

important thing for a parent is not doing anything spectacular or flashy, but it's sort of being dependable seven days a week, month in and month out, you know, sort of being there and so forth and there's nothing that really had prepared you so that you would be able to do that as a thirteen year old child.

. . . .

I think some of the things that have been said, it's almost like he is a little brother. You've had the parenting classes and so forth. You just need more time and there isn't more time. If it were something that were clear that the amount of time that you needed were measurable in months, then my decision would give me a great deal more pause. But it's not clear it's a situation that would improve immeasurably in a certain number of months. It is still problematical. You are experiencing enormous emotional growth and if that continues, you know, it's clear that you're going to be a much better person. Whether that's going to be three months, six months from now, is very problematical and would be very iffy and uncertain.

. . . .

What I'm deciding the case on are the factors that Dr. Powell had talked about, the capacity right now to provide the loving, nurturing environment which is critical to this child's best interests and welfare.

Judge Moylan, by adopting Dr. Powell's "factors," incorporated the following conclusions into his decision to terminate the appellant's parental rights.

I believe the ability of a family to provide nurturance and acceptance in a non-punitive way to a child is paramount. I believe that Kim is still in the process of being able to accept and use nurturance herself, that she has not sufficiently matured in her personality to be able to be responsible for providing nurturance for a two-and-a-half-year-old youngster, nor do I believe that's going to happen within a reasonable period of time. Kim is talking about, at age 16, taking her son and making a life for

him and herself, which I don't believe is a reasonable, that that's going to happen, that she can make a sufficiently nurturing environment for her son to develop. The second factor is that this young man has had a number of different living situations. He has, one of the concerns I always have with youngster [sic] that is in and out of a number of foster homes is whether or not they are losing the capacity to perform meaningful attachments, whether life has become so unsteady for them that they become isolated emotionally.

We also note that the court was mindful of the necessity to consider the factors set out in § 5–313(c). Specifically, the subsection provides:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community; and

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court

may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

### Services Offered to Facilitate Reunion

██ The trial court found that the services offered to appellant were timely and appropriate. The trial judge stated:

[I]t was a complex situation and those were the factors that I think kept it from working as opposed to the fact that you were not providing the right services at the right time.

. . . .

[A]s far as the timeliness and nature and extent of the services offered the child, I am satisfied that they were appropriate. . . . [A] great deal of different things were tried.

There is substantial evidence in the record to support these findings. The services provided included: visitation with James, foster care placements with James, evaluation for parenting skills, parenting classes, recommendation of structured placement at Finan Center and Shining Tree, monitoring of individual and family counseling provided at

Shining Tree, and providing a parent aide to appellant prior to her initial removal from home.

## Service Agreements

The trial judge considered the service agreements which were placed into evidence and found that a good faith effort was made on the part of the Department of Social Services to attempt to effect a good faith reconciliation. He was also satisfied that, to the extent of her capacity to do so, appellant had made a good faith effort to comply with the agreement, but concluded "it just didn't happen and, considering some of the factors, I'm not surprised that it didn't."

## Emotional Ties of Child

The trial judge found that the child's emotional ties are now clearly with his foster parents. He determined that the child has found a situation where he is bonding or forming strong attachments with this couple.

The record reflects that the child calls his foster parents "mommy and daddy," and seems to be very comfortable with them. Furthermore, testimony of Dr. Powell indicated that the child is quite attached to his present foster parents and that breaking this attachment could result in the child's becoming unable to form future emotional attachments. Conspicuous by its absence is evidence of the Department's plans for the child's future. Dr. Powell noted that:

> I do not believe her maturation is rapid enough to deal with the need her son has for a permanent living situation. He clearly has attached to Mrs. Tunic. It is my opinion, if Mrs. Tunic and her husband are available, Jimmy would do best by being placed with them....

Obviously, the child's capacity to bond and form strong emotional attachments is a factor of critical importance whose process should not be delayed. This is recognized by the legislature through its enactment of and subsequent amendment to Section 5–319 of the Family Law Code, which requires that a guardian with the right to consent to adop-

tion file a written report with the court if a placement for adoption is not made within nine months of the decree of guardianship. Notice of the child's status must also be given to the child's natural parents and to the child's court-appointed counsel. The court must, then and each year thereafter, review the progress which has been made toward the child's adoption and take appropriate action if the current placement is not in the child's best interest.

The legislature's concern for the permanency of the child's relationship is further manifested by its mandate that the administration provide welfare services to a child to develop and implement an alternative permanent plan if the child has been placed in foster care and cannot return to the natural parent. Md.Fam.Law Code Ann. § 5–524. Of even greater significance is the fact that the legislature has delineated specific options that the local department must consider in developing a permanency plan. They are, in order of priority, as follows:

(1) returning the child to the child's parent or guardian, unless the Department is the guardian;

(2) placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted;

(3) adoption in the following descending order of priority:

(i) by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationships and family ties; or

(ii) by another approved adoptive family;

(4) an independent living arrangement; or

(5) in exceptional situations as defined by rule or regulation, long-term foster care.

Md.Fam.Law Code Ann. § 5–525(c) (1989).

The statute further requires that a written permanency plan must be prepared within 60 days by the local depart-

ment and maintained in the agency's case record. If the child is under the jurisdiction of the juvenile court, the department must furnish the plan to the child's parents, the child, or the child's counsel, and to the juvenile court. Md.Fam.Law Code Ann. § 5–525(d) (1989).

Although Mrs. Tunic apparently was willing to seek adoption, if given the opportunity, the record is unclear as to the Department's and the Tunics' specific plans in that regard. It would not appear to be in the child's best interests to be placed in yet another foster home situation. As Dr. Powell put it:

> One of the concerns I always have with youngster [sic] that is in and out of a number of foster homes is whether or not they are losing the capacity to form meaningful attachments, whether life has become so unsteady for them that they become isolated emotionally.

If, on remand, further evidence might reveal plans for the child's future of a permanent nature, that evidence would be supportive of the petition, while evidence to the contrary may cause the trial court to reconsider its opinion.

### Adjustments of Child

The trial court found that James has made an excellent adjustment in the home of his foster parents. The child's present foster mother testified that James eats well, is at a good weight, and is basically healthy. She further reported that she spends the entire day at home and that James spends a lot of quality time with her husband on weekends.

### Efforts of the Natural Parents

The trial judge found that appellant had made a good faith effort to bring about reunion of her and the child, but said that the circumstances and conditions are such that he was persuaded by clear and convincing evidence that it would not be in the child's best interest to return him to appellant's care.

In considering the extent to which appellant has maintained regular contact with the child, the trial court stated:

> Kimberly was working on significant problems of her own and trying to be a child and trying to grow up, as well as taking on the heavy responsibility of trying to be a parent.... I think she tried, and she kept in contact but it just wasn't something that was geared to work.

Further, the Department presented substantial evidence that the quality of these contacts was poor. Appellant terminated her first two visits with James at Shining Tree after 15 minutes and half an hour, respectively. One month later she cancelled a scheduled visit and, by December 1987, Department records continued to reflect little bonding between appellant and James despite repeated attempts by appellant's social worker to encourage such interaction. The trial court did note, though, that there was regular communication maintained by appellant with the Department.

Concerning appellant's payment of a reasonable part of the child's substitute physical care and maintenance, the trial court recognized that as a school student, she was financially unable. It stated, though, that her financial inability to provide a home was not a factor in his decision.

Finally, the trial court found that there were no additional services that could be offered which would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable period of time. An ascertainable period of time was measured "from eighteen months of the time the child was placed in placement."

The record reflects that appellant already had received numerous services between April 30, 1987, when she was adjudicated CINA, and October 21, 1988, when she discussed giving up custody of the child with her social worker. Further, Dr. Powell testified that appellant would not mature sufficiently within a reasonable period to be responsible for the child.

Based upon our review, we believe that Judge Moylan substantially made findings of fact supported by the evidence pursuant to criteria contained in Section 5–313(c).

## Conclusion

Justice Blackmun, in delivering the opinion of the Supreme Court in *Santosky v. Kramer*, 455 U.S. 745, 766–67, 102 S.Ct. 1388, 1401–02, 71 L.Ed.2d 599 (1982), stated, *inter alia:*

> "Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" at the *factfinding* proceeding. *Lassiter v. Department of Social Services*, 452 U.S. [18], at 27, 101 S.Ct. [2153], at 2160 [68 L.Ed.2d 640 (1981)]. As *parens patriae*, the State's goal is to provide the child with a permanent home. See Soc.Serv.Law § 384–b.1.(a)(i) (statement of legislative findings and intent). Yet while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds. § 384–b.1.(a)(ii). "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley v. Illinois*, 405 U.S. [645], at 652, 92 S.Ct. [1208], at 1213 [31 L.Ed.2d 551 (1972)].
>
> The State's interest in finding the child an alternative permanent home arises only "when it is *clear* that the natural parent cannot or will not provide a normal family home for the child." Soc.Serv.Law § 384–b.1.(a)(iv) (emphasis added). At the factfinding, that goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home.

█ While the trial judge made commendable efforts to decide this most difficult case and made a number of findings of fact pursuant to statutory criteria, we cannot determine whether his mistaken belief that the appellant was suffering from a "disability" influenced his ultimate

decision. Given the gravity of the decision to terminate parental rights, we dare not speculate. "Accuracy" in the factfinding process is imperative. *Santosky, supra; see also Smith v. State,* 306 Md. 1, 11–12, 506 A.2d 1165 (1986). Thus, we remand, pursuant to Rule 8–604(d), to enable the trial judge to restate his factfinding with greater precision and accuracy and, of course, in conformance with § 5–313, and also to consider additional evidence with respect to the Department's future plans for the child, as discussed *supra.* The trial court is urged to set this matter for hearing forthwith.

CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED BETWEEN THE PARTIES. MANDATE TO ISSUE FORTHWITH.