651 A.2d 891

## IN re ADOPTION/GUARDIANSHIP NOS. CAA92–10852 AND CAA92–10853 IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

**No. 427, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 5, 1994.

Reconsideration Denied Feb. 14, 1995.

Julia K. Evans (Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Asst. Atty. General (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before BISHOP, ALPERT and FISCHER, JJ.

ALPERT, Judge.

Appellant, William F. (William), appeals a decision of the Circuit Court for Prince George's County terminating his rights as parent of Michael J. and Melvin J., twin brothers, and granting guardianship rights to appellee, the Prince George's County Department of Social Services. Appellant presents four issues for our review:

I. Whether the trial court erred in determining by clear and convincing evidence that it was in the best interest of the children to terminate William's parental rights?

II. Whether the trial court erred in determining that William's incarceration constituted a "disability" under section 5–313(d)(i) of the Family Law Article?

III. Whether the trial court erred in determining that William made no effort on behalf of his sons because the State denied William his constitutional right to the opportunity to develop a relationship with his sons?

IV. Whether the trial court erred in failing to admit into evidence an office memorandum which established the twins' paternal grandmother's interest in obtaining custody of the twins?

For reasons that follow, we reverse the trial court's termination of William F.'s parental rights.

## Facts and Proceedings

Melvin J. and Michael J. were born on October 20, 1991. At the time, their mother, Melvina J. (Melvina), was only 14 years old and was herself under the care and custody of the Prince George's County Department of Social Services (D.S.S.).[1] Ap-

---

[1] Melvina had been adjudicated a Child in Need of Assistance (CINA) and remained in foster care during her pregnancy. Md.Code Ann., Cts.

pellant, the children's father, was 21 years old. He was present at George Washington University Hospital when the twins were born.

Two days after the birth, Melvina and the children were discharged from the hospital. Because of Melvina's age, a shelter care hearing was immediately held and it was determined that Melvina and the twins would be placed in the physical custody of Melvina's stepfather and mother, Mr. and Mrs. G. Legal custody, it was decided, would remain with D.S.S. William was not present at this hearing.

Shortly thereafter, following a heated argument with her stepfather, Melvina left her mother's house without the children and returned to live with William. On November 13, 1991, Mrs. G. brought the twins to William's home because, as a result of her work schedule, she was no longer able to provide full-time care to them. Two days later, Melvina voluntarily placed herself and the twins in foster care with D.S.S. Melvina did not inform William prior to doing so, though they had apparently discussed foster care as an option for the children. During this conversation, William suggested that his mother, Joan W., could take care of the children until he could get himself together. Melvina responded, "That's up to you, I don't really care."

On December 3, 1991, a merits hearing was convened in order to determine whether the twins were "children in need of assistance" (CINA). Md.Code Ann., Cts. & Jud.Proc. § 3–801 (1989). Both Melvina and William were present. The court, however, rescheduled the hearing at William's request in order for him to obtain counsel. William informed the court at this time that his mother would be a prospect for taking care of the children. After the hearing, Margaret Craig, who was the social worker assigned to the twins' case, spoke with Melvina and William about their plans for the

---

& Jud.Proc. § 3–801 (1989). She was hospitalized during her pregnancy, after having been diagnosed with syphilis.

children and discussed with them what services D.S.S. could offer.

On December 12, 1991, D.S.S., after holding an administrative meeting, determined that the "permanency plan" for Michael and Melvin should be changed from reunification with their parents to adoption. The reason for this change of plan, according to Ms. Craig, was that D.S.S. felt that Melvina was "[un]able to be a stable influence on the children" and that William "did not want to have custody." Written notice of D.S.S.'s decision was sent to William. This notice informed William that he should contact Ms. Craig if he had any questions concerning the change in permanency plan. D.S.S. did not receive any response from William.

On December 30, 1991, the rescheduled merits hearing was held; however, neither Melvina nor William was present. The court, nevertheless, proceeded with the hearing and determined that Michael and Melvin were CINA.

In January 1992, the twins' case was transferred to the adoption unit of D.S.S., and another social worker, Marcia Goldfine, was assigned the case. On June 16, 1992, Ms. Goldfine, on behalf of D.S.S., filed a Petition for Guardianship with Right to Consent to Adoption and/or Long–Term Care, with respect to each child. The dual petitions sought to terminate the parental rights of Melvina and William and place the two children in the full custody of adoptive parents.

On August 27, 1992, William filed a Notice of Objection to the petitions filed by D.S.S. In this objection, he requested that one of his family members have guardianship of Michael and Melvin until "I get myself in order." In September 1992, while the petitions were still pending, William was arrested on drug distribution charges and placed in the Washington D.C. Department of Corrections. He was sentenced to two years probation and required to complete a nine-month drug treatment program. On June 15, 1993, D.S.S.'s petition for guardianship was heard before the Circuit Court for Prince George's County. At this time, William had already been sentenced on the drug charges but was still in jail awaiting

commencement of his treatment program, which was scheduled to begin the last week of June, 1993.

After a one and a half hour trial, the court granted D.S.S.'s petition for guardianship as to both children and ordered that the parental rights of William be terminated. Applying the factors set forth in section 5–313 of the Family Law Article, the court found that William had not accepted any of the services that were offered him by D.S.S. and had otherwise failed to make even a minimal effort to assume responsibility for the children. The court also found that, by virtue of his incarceration, William suffered from a "disability" under section 5–313(d)(i). This disability, the court found, rendered him "unable to care for the immediate and ongoing needs of the children." The court concluded that the best interests of the twins would be served in the guardianship of the D.S.S. and ultimately in the care of adoptive parents.

William appeals this decision, arguing that there was not clear and convincing evidence before the trial court that the best interests of the children would be served by terminating his parental rights. He claims that D.S.S. failed in its statutory obligations by neglecting to make any effort to communicate with him and provide services that would facilitate a reunion with his children. William further claims that, by failing to extend services to him, D.S.S. denied him the opportunity to establish a relationship with his sons in violation of his constitutional right to do so. William also argues that the trial court erred in finding that his incarceration constituted a "disability" under section 5–313(d)(i).

Based on our review of the record and the trial court's application of the statutory factors, we hold that there was not sufficient evidence presented by appellee to meet its burden of establishing by clear and convincing evidence that William's parental rights should be terminated and that the best interests of Michael and Melvin would be served in the custody of foster parents rather than in his care or the custody of a member of his family. While there was no doubt evidence indicating that William did little to accept responsibility for his

sons, the evidence also established that D.S.S. failed to provide William with those services that it was statutorily obligated to provide prior to taking the extreme measure of terminating his parental rights. It was appellee's burden in the court below to demonstrate that it had offered to provide these services and that it was in the children's best interests to terminate William's parental rights. We hold that the Department failed to meet this burden. Moreover, the court erred, we believe, when it found that William's incarceration constituted a "disability."

### Discussion

Section 5–313(a) of the Family Law Article provides, in pertinent part, that:

A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, *if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights* as to the child and that ... (2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance....

Md.Code Ann., Fam.Law § 5–313(a)(1989) (emphasis added).

Thus, the burden in this case was on D.S.S. to establish by clear and convincing evidence that the best interests of Michael and Melvin would be achieved by permanently severing their ties with their father and placing them with adoptive parents. In determining what is in the best interest of a child, the court is required to consider an array of factors detailed in subsection (c) of 5–313:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

Md.Code Ann., Fam.Law § 5–313(c).

In addition to these factors, both the Court of Appeals and the Supreme Court of the United States have recognized

another "important interest" that must be considered before parental rights are terminated—the fundamental right of a parent to raise his or her child. *Santosky v. Kramer*, 455 U.S. 745, 759, 102,S.Ct. 1388, 1397–98, 71 L.Ed.2d 599 (1982); *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112–13, 642 A.2d 201 (1994). This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions. *Id.* The Court of Appeals has stated:

> [A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

*Walker v. Gardner*, 221 Md. 280, 284, 157 A.2d 273 (1960).

The significance of a parent's right to raise his or her child is further evidenced by the legislative policy of this state as set forth in the Family Law Article itself. The legislature has declared:

> (1) that it is the policy of this State to promote family stability, to preserve family unity, and to help families achieve and maintain self-reliance by:
>
> (i) responding to financial and family crisis through direct provision of family counseling and supportive services; and
>
> (ii) referral to appropriate community resources; and
> (2) this State has the responsibility to provide services that prevent the kind of family dissolution and breakdown that requires protective services or out-of-home placement.

Md.Code Ann., Fam.Law § 4–401 (1991). In this same vein, among the stated purposes of Title 5 of the Family Law Article is to protect children from "unnecessary separation from their natural parents." Md.Code Ann., Fam.Law § 5–303(b)(1)(i).

With these principles in mind, we turn to the factors set forth in § 5–313(c) and their application by the trial court in this case.

## I.  FACTORS UNDER SECTION 5–313(c)

### Services Offered by D.S.S. to Reunite
### William and his Sons

The first factor that the court must consider under § 5–313(c) is "the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent." § 5–313(c)(1). With respect to this factor, the trial court held that "the testimony supports the finding that [services] were made, [but] they were not accepted" by William. The court found that William made no effort to assume responsibility for the children other than filing a formal objection to D.S.S.'s petition and eliciting a call from his mother to D.S.S. Appellant contends that the court's analysis of this factor is clearly erroneous, and that there was no evidence presented at trial that the Department made "even a half-hearted attempt to encourage or strengthen William's parental relationship with the twins."

The trial court heard testimony from both of the social service workers assigned to the twins' case, Margaret Craig and Marcia Goldfine. Ms. Craig testified that during the entire time that she was assigned the case—from October 1991 when the twins were born until January 1992—she had only one contact with William. On December 3, 1991, the original date of the CINA hearing, she discussed with both Melvina and William what their plans were for the children and what services D.S.S. could provide them. Aside from this conversation, the Department communicated only with Melvina regarding the children. Ms. Craig testified:

Q  Is it accurate to say the Department of Social Services used as a source of information Melvina [ ] and sought out no other sources?

A .... While I was the worker, Melvina was my source of information about [William], and I did not make other efforts.

\* \* \* \* \* \*

Q Based on what you testified, is it accurate to say that between the time the children were placed in foster care and the time that the plan was changed to adoption, there was [sic] no efforts on the part of the Department to contact [William]?

A We made efforts to try to contact him through Melvina, which was our only source.

Q The Department knew at the time they were using Melvina as a source she was a rather unreliable teenager, didn't you?

\* \* \* \* \* \*

A Yes.

When the twins' case was eventually transferred to the adoption unit of D.S.S. in January, 1992, Ms. Craig admitted that the Department "didn't know anything really for sure about the father's situation since we had no contact with him." Indeed, it appears that the Department, although originally armed with knowledge of the address where William was living, did little, if anything, to communicate with him.

Q During the time you were handling the case, you received no information indicating that [William] had moved from the original address that you were provided?

A [William]?

Q Yes.

A Right. I had no indication of his whereabouts other than what I was told by Melvina.

Q Let's put it this way. During the time you were handling the case, is it accurate to say that you had no reason to believe that had you or any other person in the Department of Social Services sent correspondence to [William] at the same address that Exhibit Number 6 was mailed, that that correspondence would not be received by [William]?

A To the best of my knowledge during that time, [William] was residing at Quincy Place, or that was the place that he and his family could reach him. I had no other knowledge of any other place to reach him.

\* \* \* \* \* \*

Q Despite having that information, you don't have any record of the Department of Social Services writing to [William] and offering him any classes or visitation or anything else with regard to the twins in order to accomplish unification with his twins?

A We had no address to write him to other than the Quincy Street address. To my knowledge, we didn't write and offer him services.

Q As of January 27, 1992, did the Department have any reason to believe that the Quincy Street address was no longer the residence of [William]?

A I don't recall specifically. I believe at that time it was the only place we knew we could contact him because he had relatives and friends in that neighborhood.

\* \* \* \* \* \*

Q Ms. Craig, does the Department of Social Services have any experience with coordinating efforts to locate a person who may be residing in the District of Columbia through the various agencies of the Government in the District of Columbia?

A We have an absent parent locator department.

Q Was the absent parent locator department utilized in this case in an effort to locate [William]?

A They may have had the case referred to them. Whether they took any action during that initial time, I am not sure. We felt we knew where he was.

Q Yet you wrote him no correspondence, is that right?

A Melvina was seeing him during those times. So our assumption was that he was—that he could be located there.

Ms. Craig was asked on cross-examination:

Q So as of January 27, 1992, the Department of Social Services had no information indicating [William] could not effectively parent his twin boys?

A  In terms of actual care of them, no.

Thus, the record in this case is devoid of any evidence that D.S.S. actually provided to William any of the wide range of "services" it offers. Ms. Craig was asked whether D.S.S. offered William "any classes or visitation or anything else" in order to accomplish reunification with the twins. She stated, "To my knowledge, we didn't write and offer him services." Melvina, in contrast, did receive counseling, parenting classes, and other services. When asked why Melvina was offered services but William was not, Ms. Craig responded:

> The difference is that we felt we knew Melvina needed parenting skills training. We felt we knew she didn't know how to parent effectively. We didn't know anything about the father [William] at all basically and were asking him to demonstrate parenting skills. If he could demonstrate parenting skills, we could not request any further classes or training for him.

Ms. Goldfine likewise testified that during the entire time that she was assigned the twins' case, from January 1992 until the trial, she also did not have any contact with William. Indeed, when the petition for guardianship was filed in June 1992, Ms. Goldfine had yet to make any attempt to communicate with him. It was not until September 3, 1992, nine months after first receiving the twins' case, that Ms. Goldfine sent a letter to William's home address requesting that he contact her so that they could "discuss plans for Melvin and Michael." [2] William did not receive this letter, however, since he was incarcerated at the time. Apparently unaware of this, Ms. Goldfine sent four more letters via certified mail to his home address on January 20, January 28, February 3, and February 22, 1993, each of which was returned unclaimed.

---

**2.** When asked at trial why she did not attempt to contact William prior to filing the petitions, and waited until September, 1992, Ms. Goldfine stated she "had no knowledge that he was at that address." She admitted later, however, that when she received the case from Ms. Craig in January 1992, the file indicated what William's address was.

Ms. Goldfine testified that she did not learn that William was in jail until February 18, 1993, over a year after she took the twins' case, when William's mother, Mrs. W., called her. Upon discovering that William was incarcerated, Ms. Goldfine sent a letter to him in jail. William called her office after receiving this letter, but she was not in. Ms. Goldfine did not communicate with William after that. She admitted that she made no attempt to go to William's house or to the Department of Corrections to locate him. Ms. Goldfine testified:

Q Is there any reason that you did not attempt to contact [William] for the six months you had handled the case up to September 1992?

A I really had no knowledge that he was at that address. It was just at that time that I contacted him, attempted to contact him.

Q Were you provided the entire file from Ms. Craig at the time you assumed responsibility for this case?

A The part that had to do with the children.

Q Would you agree that at that time the files reflected the address where [William] could be contacted was 52 Quincy Street?

A Yes.

Q During the succeeding eight months before you wrote [William] in September 1992, you had not received any information that [William] had changed his residence, had you?

A That's correct.

Q Are you provided a vehicle by the Department of Social Services?

A A car? .... There are State cars available.

Q If you request a State car and provide acceptable reason, one will be provided to you to carry out your tasks?

A I use my own vehicle.

Q Are you telling the Court that, in addition to having a vehicle available to you by the State, you would go so far as

to use your own vehicle in carrying out your responsibilities for the Department?

A Yes.

Q Did you ever go out to 52 Quincy Place to meet with [William]?

A No, I didn't.

Q Did you ever go anywhere between February 10, 1992, and September 1992 to try and locate [William]?

A No, I did not.

The extent of Ms. Goldfine's work on the twins' case was summed up in her response to a question posed by counsel for appellant:

Q Is this an accurate summary of your work on this case between February 10, 1992, and February 18, 1993, you had contact with Melvina [ ], you wrote to [William] on five occasions, four to the Quincy Street address and one to the jail, and sometime you contacted the absent parent locator and nothing else was done on your part?

A In terms of [William] or both parents?

Q In terms of [William].

A That's correct.

An "administrative review" of the twins' case was conducted by D.S.S. on May 7 and November 2, 1992. Ms. Goldfine admitted that when she submitted the case for administrative review, she provided no information that was not already in the twins' file as transferred by Ms. Craig.

■ We believe that the services offered to William and the efforts made by D.S.S. to attempt to reunite him with his sons fall short of what is required under applicable law. The legislature has specified an array of services that D.S.S. and other local social service departments are required to make available. These services include family counseling to teach child care and parenting skills, as well as information and referral services to teach families how to locate and use community services. Md.Code Ann., § 4–402(b)(2) (1991). Rules and regulations have also been promulgated governing

the services to be provided to families in an effort to "help preserve family unity and stability," COMAR 07.02.01.02.B(3), and "facilitate or maintain successful reunification of the child and parent." COMAR 07.02.11.14.A The range of services that may be provided under these regulations includes, *inter alia,* family counseling, parenting classes, day care service, vocational counseling and training, and even transportation costs for family visits. COMAR 07.02.11.14.B

Aside from Ms. Craig's discussion with William on December 3, 1991, none of the above mentioned services were communicated or provided to William. Both Ms. Craig and Ms. Goldfine admitted this at trial. It is true that attempts were made to contact William, but these attempts amounted, in total, to six letters, five of which he did not receive. Clearly, more was required of D.S.S. under the above-mentioned statutes and regulations. Moreover, we find it disturbing that by December 12, 1991, less than two months after the twins' birth, D.S.S. had already decided to change the "permanancy plan" from reunification with William to adoption. By January, 1992, the Department had transferred the twins' case to its adoption unit. These actions were taken by D.S.S. despite having communicated with William on only one occasion. This is plainly inconsistent with subtitle 5 of the Family Law Article, which mandates:

The Administration shall provide child welfare services to a child and the child's parent or guardian:

(1) to assist in preventing the necessity of placing the child outside of the child's home;

(2) to reunite the child with the child's parent or guardian after the child has been placed in foster care. . . .

Md.Code Ann., Fam.Law § 5–524 (1991).

█ We note that the Court of Appeals has held that where "attempts at reunification would obviously be futile, the Department need not go through the motions in offering services doomed to failure." *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 117, 642 A.2d 201 (1994). If no amount of services will result in reunification of the parent with his or her child,

then the Department of Social Services need not meet its statutory obligations before seeking to terminate parental rights. *Id.* at 119, 642 A.2d 201.

In *In re Adoption No. 10941*, the Court reversed the trial court's ruling that the Montgomery County Department of Social Services failed to "meet its obligation to attempt to unify the Mother and the Child by affirmatively offering and providing services." *Id.* at 111, 642 A.2d 201. But the case *sub judice* is easily distinguishable from that case. In *In re Adoption No. 10941*, despite the mother's continuous refusal to accept help, extensive efforts were made by the Montgomery County Department of Social Services to facilitate reunification of the mother with her child. The social worker assigned to the case scheduled a family evaluation with the mother, child, and grandparents. *Id.* at 109, 642 A.2d 201. The case worker went to the mother's apartment on several occasions to transport her to evaluations and other appointments. *Id.* at 108–09, 642 A.2d 201. The caseworker visited the mother in the hospital and attempted to arrange mental health services for the mother through a community outreach program. *Id.* Another social worker from the outreach program tried to contact the mother on five occasions to discuss the program, but she refused to allow the social worker into her home and called the police. *Id.* The caseworker also attempted to arrange visitation for the mother with her child. *Id.* at 110, 642 A.2d 201. All of this was attempted even though the mother constantly rebuked the Department's efforts.

Similarly, the case of *In re Adoption 09598*, 77 Md.App. 511, 551 A.2d 143 (1989), involved "massive" efforts undertaken by the Prince George's County Department of Social Services, the same appellee as in the present case. *Id.* at 514, 551 A.2d 143. The chancellor found numerous services that were offered the parent, including psychiatric therapy, a parenting skills class, other counseling, medical assistance, public assistance, and referral to the Tenant Assistance Program in the District of Columbia. *Id.* at 520, 551 A.2d 143. This Court affirmed the chancellor's ruling terminating the parent's

rights. *Id.* at 525, 551 A.2d 143. *See, also, In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A,* 100 Md.App. 262, 641 A.2d 889 (1994) (where services provided by the Department of Social Services included supervised visits and counseling); *In re Adoption No. 2428,* 81 Md.App. 133, 143–44, 567 A.2d 139 (1989) (where services provided included "visitation with [the child], foster care placements with [the child], evaluation for parenting skills, parenting classes, recommendation of structured placement at Finan Center and Shining Tree, monitoring of individual and family counseling provided at Shining Tree, and providing a parent aide to [mother]" ), *cert. denied,* 318 Md. 683, 569 A.2d 1242 (1990).[3]

■ In the present case, D.S.S.'s efforts at reunification amounted to a single conversation with William and the mailing of several form letters to him. While William was undoubtedly delinquent in his parenting of the twins for the first two and one-half years of their lives, the evidence at trial did not establish that D.S.S.'s attempts at offering services would be futile, nor did the evidence demonstrate that no amount of reunification services would ever accomplish reunification of William with his children. *In re Adoption No. 10941,* 335 Md. at 117, 119, 642 A.2d 201. As the trial judge noted, William appears, at least at present, to be genuinely concerned about the welfare of his children. The court stated:

If anything, I think [William] has indicated his love for these children by his consistent refusal—not that he needs to—but his consistant refusal to consent to their adoption.

D.S.S. was particularly derelict in failing to make a sufficient investigation of the possibility of placing the children with William's mother. Ms. Goldfine testified that she received a phone call from William's mother, who was living in California at the time. Mrs. W. informed Ms. Goldfine in this conversation that she was moving to Maryland in August 1993

---

**3.** We recognize, of course, that the amount of services required depends upon the circumstances in each case and numerous other factors. We set forth these cases by way of example only and not to establish that any specific level of services is required.

and would be willing to take custody of the children at that time. Ms. Goldfine testified that, based on her conversation with Mrs. W., she believed that Mrs. W. sounded like "an appropriate placement." She testified that her supervisor also felt that Mrs. W. "sounded good" and that she should pursue it. Ms. Goldfine wrote Mrs. W. on February 22, 1993, to follow-up their phone conversation. Apparently forgetting that Mrs. W. had conveyed an intention to return to Maryland permanently, she informed Mrs. W. in this letter that if she wished to have custody of the children she would have to travel to Maryland to pick them up. Ms. Goldfine concluded the letter by telling Mrs. W. that if she was still interested in assuming responsibility for the children, she should call her. Ms. Goldfine never communicated with Ms. W. again.[4]

Appellee's failure to conduct any further investigation regarding placement with Mrs. W. is in direct conflict with section 5-525(c) of the Family Law Article, which sets forth a hierarchy of placement alternatives:

(c) *Development of a permanency plan.—*

\*  \*  \*  \*  \*  \*

(2) To the extent consistent with the best interests of the child under foster care, *the local department shall consider the following permanency plans, in descending order of priority:*

(i) *returning the child to the child's parent* or guardian, unless the department is the guardian;

(ii) *placing the child with relatives* to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted;

(iii) *adoption* in the following descending order of priority:

1. by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of

---

4. Ms. Craig testified that during the time she had the case, she made no effort to contact William's mother for potential placement of the twins.

time to have established positive relationships and family ties; or

    2. by another approved adoptive family;

    (iv) placing the child in a court approved permanent foster home with a specific caregiver;

    (v) an independent living arrangement; or

    (vi) long-term foster care.

Md.Code Ann., Fam.Law § 5–525(c) (Supp.1994).

█ Thus, once D.S.S. determined that reunification of the children with William was not possible, it was required to consider placing them with his relatives as the "next best option." *In re Adoption No. 10941*, 335 Md. at 121, 642 A.2d 201.

## Social Service Agreements

The second factor under 5–313(c) requires the court to consider "any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement." § 5–313(c)(2). In the case at bar, there was a service agreement between Melvina and D.S.S. that had been entered into shortly after the birth of the twins, in order to clarify "the responsibilities of all parties to try to make the placement work." The agreement provided that Melvina and the twins would stay with her mother and stepfather and that D.S.S. would supervise the placement and provide counseling and other assistance. The agreement was signed by Melvina and D.S.S. only; William was not a party to it. The only reference in the agreement to William was a provision that "D.S.S. will assist in helping arrange visits with the babies' father." Ms. Craig admitted that there was no effort to include William in the agreement because, she said, D.S.S. "[was not] working with him at that point."[5] According to

---

5. This contention is certainly questionable since at the time the agreement was entered into, the twins had only just been born. Ms. Craig subsequently saw William at the merits hearing held on December 3,

appellant, D.S.S.'s failure to extend a service agreement to William "signifies D.S.S.'s total disregard for William's role as the father of his sons."

The trial court found that since there was no agreement between William and D.S.S., this second factor "needs no comment." We agree that this factor is not applicable here. The absence of a service agreement between a parent and the Department of Social Services should not weigh against the parent or in favor of terminating parental rights.

### Feelings of Children and Emotional Ties with Parent

The third factor under 5–313(c) requires the court to take into consideration "the child's feelings toward and emotional ties with the child's natural parents." § 5–313(c)(3). The trial court found this factor to be inapplicable as well since Michael's and Melvins' feelings towards their father "are nil, if anything." This finding was apparently derived from the fact that D.S.S. obtained custody of the twins shortly after their birth. William saw his children only for the first two days of their lives. He contends that the lack of emotional ties between him and his sons is the result of D.S.S.'s failure to provide him with services.

There is some merit in this argument. Where there is a patent failure on the part of Social Services to fulfill its statutory obligations and provide at least minimal counseling and services, this factor should be given less weight than it otherwise would, and should not be dispositive, no more than any other one factor is, of the parent's right to raise the child. We cannot ignore the fact that William himself made no efforts to visit the children or check on their welfare, other than a telephone call he alleges he made in early 1993. Still, the trial court should have taken into consideration the extent of the services offered to William to foster emotional ties

---

1991, and by her own admission spoke with him at length at that time. Surely, this would have been the perfect opportunity to include William in the agreement and set out his responsibilities as well as D.S.S.'s with regard to the children.

between him and his sons. While this always would be an important factor to be considered, under the unique circumstances of this case we can understand why the trial court gave little weight to the lack of emotional ties between appellant and the children.

### Adjustment of Children to Home, School and Community

The fourth factor the court must consider is "the child's adjustment to home, school, and community." § 5–313(c)(4). With respect to this factor, the trial court stated: "I heard one piece of evidence [the children] were doing well in the foster care home, and that is what the Court will find." The "one piece of evidence" referred to by the judge was Ms. Goldfine's testimony that when she went to see the children, they appeared to be happy and were "healthy, normal, active little boys." Given this limited evidence, the trial court could not have found by clear and convincing evidence that it was in the best interests of Michael and Melvin to terminate William's parental rights. This evidence, while favorable to appellee, is not sufficient in light of the heavy burden faced by appellee. In the absence of further evidence that the children have adjusted well in their present environment and are living in a stable foster home, this factor should not weigh against William.[6]

---

6. We note, however, that there was some evidence indicating that the lives of the children have been less than stable. According to William, the twins were moved to a new foster home sometime in early 1993. Also, a Foster Care Review Board Report, which was issued after trial but for some reason was included in parties' joint record extract, states that Michael and Melvin were *again* moved to a new foster home on September 11, 1993, and later returned to a previous foster home on October 8, 1993. The reason for the latter move was that, "placement [was] disrupted." (E.140) Under Maryland's statutory scheme, a Department of Social Services is required to develop and implement a permanancy plan that is in the best interests of the child and that will provide a stable, secure environment in which the child can grow. The Court of Appeals has stated:

> The overriding theme of [Maryland's] ... legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the

### Efforts of Parent

The fifth factor provides that the court must consider: the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent ...;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement. . . .

§ 5–313(c)(5).

We recognize that there was evidence presented at trial indicating that William took little or no initiative in seeking out the services of D.S.S. and assuming responsibility for the twins. There was testimony, for instance, that he failed to appear in court; that he never asked D.S.S. to visit the twins; and that other than a single attempt to call Ms. Goldfine, he never contacted D.S.S. himself to check on the children. Yet, the record does not support the trial court's conclusion that, "there were *no* efforts made 'on [William's] part" (emphasis added). As appellant argues, William has manifested at least some parental concern. He was present in the hospital when the children were born. He suggested to

---

Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status.
*In re Adoption No. 10941,* 335 Md. at 106, 642 A.2d 201.

Melvina and to the court that his mother could take care of the children. He initiated his mother's call to Ms. Goldfine to check on the children and to ask about the possibility of obtaining custody. And he has objected from the beginning to Melvin and Michael being placed with adoptive parents.

Furthermore, William's testimony at trial demonstrates that following his rehabilitation he intends to assume more responsibility for the children. He stated that he plans on finding work when he leaves the rehabilitation program and will take advantage of the program's assistance in finding housing. He testified that if he is able to get the twins back, he will do whatever he can for them and would probably place them with his mother or father initially. He stated that he felt he was capable of taking care of the children, but admitted that he would readily accept any services that D.S.S. could provide.

While the trial court was clearly in a better position to determine whether to believe William's testimony or not, we hold that there was not sufficient evidence to support the court's conclusion regarding this factor, particularly in light of the heavy burden faced by appellee.[7]

### Services Offered to Parent Before Placement

The sixth factor to be considered is "the services offered to the natural parent before placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals." We previously addressed the services offered to William in our discussion of the first factor. We note, however, that this factor pertains only to those services provided prior to placement of the children, which, in this case, occurred early on in the children's lives in November 1991. No services were offered at all to William prior to this time.

-----

7. The trial court correctly found that the factor set forth in subsection (c)(5)(iv) was inapplicable since more than 18 months had passed since placement of the children, which occurred in November, 1991.

Based on our review of the evidence supporting each of the above factors, we hold that there was not sufficient evidence presented by appellee with respect to the above factors to meet its burden of establishing by clear and convincing evidence that William's parental rights should be terminated. In particular, we believe that the Department of Social Services failed to make the requisite efforts to provide counseling and other services to William prior to taking the extreme measure of terminating his parental rights. Simply stated, D.S.S. should have done more.

## II. FACTORS UNDER SECTION 5–313(d)

Section 5–313(d) sets forth additional factors that the court must consider in instances where a child has been adjudicated to be a child in need of assistance (CINA), as in this case. This section provides:

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, ... the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family; or

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able.

Md.Code Ann., Fam.Law § 5–313(d)(1).

This subsection is satisfied if any one of the above conditions exist. *In re Adoption No. 09598,* 77 Md.App. at

526, 551 A.2d 143. In the case *sub judice,* appellant challenges the trial court's finding that subsection (d)(1)(i) has been met, namely that William suffers a "disability" because he was incarcerated, and was therefore "unable to care for the immediate and ongoing physical or psychological needs of the child[ren] for long periods of time." § 5–313(d)(1)(i).

The question of whether a parent's incarceration constitutes a "disability" is an issue of first impression in this state. We agree with appellant that the court erred when it found that William's imprisonment was a "disability," for several reasons. First, the term "disability" is defined in section 5–301(c) and is expressly limited to mental disorders, mental retardation, chronic alcoholism, and drug addiction. Md.Code Ann., Fam.Law § 5–301(c). Even assuming the definition of "disability" was not so limited, this Court has refused to expand by judicial fiat the definition of this term to include other impediments to a parent's ability to care for his or her child. In *In re Adoption No. 2428,* 81 Md.App. 133, 138, 567 A.2d 139 (1989), for example, we held that a mother's minority did not constitute a disability on the basis that it was not included in the statutory definition.

Moreover, William's incarceration was temporary, and not permanent or long-term in nature as section (d)(1)(i) contemplates. At the time of trial, William had been incarcerated for approximately nine months.[8] Within a week or two after trial, however, he was scheduled to begin a nine-month drug rehabilitation program. According to William, he would be allowed to visit his sons during this program. Following completion of the program, William would be free, subject to the terms of his probation. Thus, the trial court erred not only in finding that William's incarceration constituted a "disability," but also in holding that his imprisonment rendered him "consistently unable" to provide for the children's needs "for long periods of time." The incarceration of a parent does not *per*

---

8. He was apparently given time-served for his offense, since he testified that his sentence was two years probation.

*se* constitute a "disability" under 5–313(d)(1)(i) and justify the termination of his or her parental rights. *See, In re William B.*, 73 Md.App. 68, 73, 533 A.2d 16 (1987) (holding that mere alcoholism of parent is not grounds for removing a child from home under CINA adjudication, in the absence of other evidence that the parent's drinking affects his/her ability to provide ordinary care and attention), *cert. denied,* 311 Md. 719, 537 A.2d 272 (1988).

We note also that there is no longer a statutory presumption in Maryland that when a child has been under continuous foster care for two years it is in his or her best interests for the court to grant guardianship to the child placement agency and terminate parental rights. *Washington County Dept. of Soc. Servs. v. Clark,* 296 Md. 190, 197, 461 A.2d 1077 (1983). In *Clark,* the Court of Appeals held that former Article 16, § 76(c), which provided for such a presumption, violated a parent's right to procedural due process and was unconstitutional. *Id.*[9]

## III.

Because we hold that the trial court's decision to terminate William's parental rights under the factors in 5–313 was not

---

**9.** Appellee's reliance on *Keeney v. Prince George's County Dept. of Soc. Servs.*, 43 Md.App. 688, 406 A.2d 955 (1979), *cert. denied,* 286 Md. 748 (1980), is therefore misplaced. In *Keeney,* this Court affirmed the trial court's application of this presumption to a father who was incarcerated for more than two years. *Id.* at 690, 406 A.2d 955. We applied Article 16, § 75(a), which provided:

After a child has been under continuous foster care for a period of two consecutive years under the custody of an agency authorized by law to make placements, *it shall be presumed by the court that it is in the best interests of the child* to award to that agency a decree granting guardianship with the right to consent to adoption or long term care short of adoption, without the consent of the natural parent or parents; provided that notice otherwise required by law has been given.

*Id.* (emphasis in original).

Section 75(a), pursuant to chapter 514 of the Laws of 1982, was subsequently repealed by the legislature and reenacted with additions as section 76(c). Section 76(c) was the statute declared unconstitutional in *Washington County Dept. of Soc. Servs. v. Clark,* 296 Md. at 197, 461 A.2d 1077.

supported by clear and convincing evidence, we need not address appellant's claim that D.S.S. denied William his constitutional right to raise his children and develop a relationship with them.

## IV.

At trial, appellant attempted to introduce into evidence a three-page handwritten memorandum to Ms. Goldfine from her supervisor. This memorandum memorialized the supervisor's phone conversation with William's mother, Mrs. W., when she called D.S.S. from California in February, 1993 to ask about the possibility of getting custody of the children. The memo informed Ms. Goldfine that Mrs. W. was interested in raising the twins and did not want them to go out of the family. The supervisor stated in the memo that Mrs. W. "sounded not bad" and suggested to Ms. Goldfine that she should look into it further.

When appellant offered this memorandum into evidence, appellee objected. The trial court sustained appellee's objection, apparently on the basis that it was not part of D.S.S.'s business records.[10] Appellant contends that the trial court erred in refusing to admit the memorandum because the memo, though hearsay, falls within the business records exception and is admissible as an admission by a party opponent. Appellant also contends that the memorandum is admissible as non-hearsay because it was offered for impeachment purposes rather than for the truth of its contents.

Preliminarily, we note that none of the above reasons cited by appellant for admitting the memorandum were explained to the court by appellant's attorney, nor did appellant's attorney make any offer of proof as to what the memorandum would have established. The record reveals only the following exchange:

---

10. We say "apparently" because the colloquy between the court and counsel is rather confusing.

Q   Let me show you what has been marked as Defendant's Exhibit Number 2.  Do you recognize that document?

A   Yes.

Q   What is that document?

A   It's a memo from my supervisor stating that Mrs. W[ ] had made a telephone call.

Q   The Department actually received two contacts from Mrs. W[ ] regarding her willingness to take care of the twins?

A   She called one day when I was not in and I called her back.

Q   But this note from one of your co-workers is dated February 5, 1993?

A   Yes.

Q   Doesn't that indicate to you that there was—I will withdrew that.

Mr. McPherson:  I would offer Defendant's Exhibit Number 2.

Mr. Cohen:  Objection.

\*      \*      \*      \*      \*      \*

The Court:  A letter written to the Department from Mrs. W[ ] and it simply says something to the extent I am willing to take care of a child?   Right?

Mr. McPherson:  No, it is a detailed message from a co-worker of Ms. Goldfine taken in response.

The Court:  Based on that she called her back, is that right?

Mr. McPherson:  Yes.

The Court:  Is that part of the business record already incorporated?

\*      \*      \*      \*      \*      \*

Ms. Green:  No.

The Court: Sustained.  The letter itself is not part of the exhibit we have today.   Next question.

■■■■   Appellee claims that the failure by appellant's attorney to explain, after the objection was sustained, the

purpose for which the memorandum was being offered precludes us from addressing its admissibility on appeal. It is true that the proponent of evidence that has been excluded must proffer what that evidence would have been. *Fowler v. Benton,* 229 Md. 571, 574, 185 A.2d 344 (1962). In addition, as appellee correctly notes, when evidence is inadmissible on its face and admissible only for a limited purpose or under some theory, the proponent must also explain to the court how the evidence is admissible and why it should be received. *Ali v. State,* 314 Md. 295, 305–07, 550 A.2d 925 (1988). *See,* McLain, *Maryland Evidence,* § 103.17, 103.20 (1987). The memorandum is clearly hearsay and, as appellant now argues, would be admissible only under some exception to the hearsay rule. We agree with appellee, therefore, that appellant's explanation as to what this memorandum would have established and the grounds for its admissibility come too late. Appellant failed to preserve this issue for appeal.

In any event, as appellee acknowledges, the substance of what the memorandum states was admitted into evidence by other means. Ms. Goldfine testified that Mrs. W. had called D.S.S. on two occasions. She testified that when she spoke to Mrs. W., Mrs. W. told her that she anticipated moving back to Maryland in August 1993 and was interested in taking custody of the children. Based on Ms. Goldfine's conversation with Mrs. W., she believed that Mrs. W. "sounded like a decent—like an appropriate placement." This testimony was sufficient to establish that Ms. Goldfine should have done more to investigate the possibility of William's mother taking custody of the twins. In fact, Ms. Goldfine's supervisor instructed her to do so. Yet, Ms. Goldfine did nothing in this regard, other than send a letter to Mrs. W. Under Maryland's statutory scheme, there is a clear preference for placing a child with the parent's relatives before putting the child up for adoption or placing the child in any sort of long term foster care. Md.Code Ann., Fam.Law § 5–525(c) (1991) (See discussion, Part I).

## Conclusion

In sum, we hold that the trial court's findings under the factors set forth in section 5–313 were not supported by the evidence. In reversing the court below, we are by no means excusing William's failures as a parent, nor do we intend to convey the impression that we consider him or his mother to be a proper guardian of the children. That is not our function. Appellee simply failed to meet its burden to establish by clear and convincing evidence that the best interests of Melvin and Michael J. would be served by terminating the parental rights of appellant.

JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.