707 A.2d 926

**IN RE ADOPTION/GUARDIANSHIP NOS. 11387 & 11388, in the Circuit Court for Montgomery County, Maryland.**

No. 891, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 2, 1998.

Gina M. Serra, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellee, Montgomery Co. Dept. of Health and Human Services.

Farhat Ahmed, Gaithersburg, on the brief, for minor children.

Argued before MOYLAN, THIEME and KENNEY, JJ.

KENNEY, Judge.

On February 6, 1997, appellant, Clemy P., the natural mother of Stephon and Alphonso, filed a request for hearing in the Circuit Court for Montgomery County based upon a delay in the adoption proceedings involving her two sons. On April 23, 1997, the trial court held a hearing to assess the status of the two children, but, finding that appellant had no standing to participate in the hearing, denied appellant's request to testify and present witnesses. At the conclusion of the hearing, the court ordered that the children's placement be continued with their prospective adoptive parent. Appellant filed a timely appeal, asking this Court to address one question, which we have rephrased:

Did the trial court err when it refused to allow appellant to testify and present witnesses in a hearing conducted pursuant to Md.Code Ann. (1984, 1991 Repl.Vol., 1997 Cum. Supp.) § 5–319 of the Family Law Article (F.L.)?

Finding that the trial court did not err when it refused appellant's request to testify and present witnesses at the status hearing, we shall affirm its judgment.

## FACTS AND PROCEEDINGS

This case emanates from *In re Adoption/Guardianship No. 93321055/CAD*, 344 Md. 458, 687 A.2d 681 (1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997). In that case, the Court of Appeals summarized the applicable facts as follows:

On April 21, 1993, DSS filed petitions in the Circuit Court for Montgomery County for guardianship of Stephon and Alphonso P. and to terminate the parental rights of their parents, Clemy P. and Sam L. Stephon was born on April 16, 1989. He was committed to the custody of DSS in August 1990, was placed with his mother or other relatives until September 1991, and had been in foster care since then. He was adjudicated to be a CINA in October 1991.

Alphonso was born on August 3, 1990. He was committed to DSS at birth, resided with his maternal grandmother until September 1991, and had been in foster care thereafter.

Sam L. consented to the petition. The show cause order issued for Clemy P. was served on her on May 11, 1993. It gave her the same advice and warnings noted above and set June 25, 1993 as the deadline for filing an objection. No objection was filed, and, on October 20, 1993, upon motion by DSS, the court granted the petition and entered a judgment of guardianship. Clemy filed an appeal 32 days later, which the circuit court struck as untimely.

On July 25, 1994, through their court-appointed counsel, the children requested a hearing. They averred that a number of problems had developed since the order of guardianship had been entered. They pointed out that, under [F.L. § 5–319], DSS was obliged to make a written report to the court and to give notice to both the children's attorney and the natural parents if placement for adoption was not made within nine months after entry of the guardianship, that nine months had passed, that the children had not been placed for adoption, and that no report had been made. Underlying that problem, they averred, was the fact that they were not going to be able to remain in the home where they were then living because the foster mother was not willing to adopt them. Compounding the problem was the additional circumstance that their sister was also living in the home, that their natural parents' parental rights had not yet been terminated with respect to their sister, and that "this is causing problems for all three children, as the mother is still visiting and talking by phone with [the sister], but is not able to talk with [them], causing upset to Stephon and Alphonso." Among other things, they asked that their maternal grandmother be considered as a resource.

Three days after the children's motion was filed, Clemy P. moved to intervene. She too complained about (1) the failure of DSS to make a written report as the statute required, (2) its refusal to consider her mother as a re-

source, and (3) the impending separation of Stephon and Alphonso from their sister. She complained as well that the guardianship order was entered without any testimony and that she "did not receive notice of the Motion or Order of Default due to a change of address until the time for appeal had expired." She averred that she was then ready to resume custody of the children.

DSS opposed the children's motion and Clemy's request to intervene. As to the children's motion, it informed the court that it intended to place Stephon and Alphonso in a pre-adoptive home within 10 days and that no hearing would be necessary. As to Clemy's motion, DSS pointed out that there had never been a default order, that Clemy received all of the notices to which she was entitled, and that there were no proceedings pending before the court. The docket indicates that a "status hearing" was held by Judge McGuckian on August 11, 1994, but neither the docket nor anything else in the record indicates how, or whether, the children's and Clemy's motions were resolved.

On July 5, 1995—some 21 months after the judgments of guardianship were entered—Clemy moved to vacate them. Although she did not deny receiving a copy of the show cause order and did not deny reading it, she alleged that she "was not aware of the necessity of filing a written response" to the guardianship petitions and "remained unknowing as to the significance of [those petitions]." She claimed that she had expressly declined to consent to the guardianships, that she had informed DSS orally that she would not consent, and that she did not become aware of the judgments until a month after they had been entered. She averred that the children had still not been adopted and continued to live in foster care.

Clemy complained that she had received no notice of DSS's motion for final order and, indeed, no notice of any proceedings after the initial petition. She urged that the judgments were defective because they were based on her presumed consent and she was never informed of her right to revoke that consent. Her theory seemed to be that, once

DSS took the position that her non-response amounted to a consent, it was obliged to inform her of her right to revoke that consent. She complained as well about not receiving a copy of the judgments or of any status report required by [F.L. § 5–319].

On December 5, 1995, the court entered an order vacating the judgments of guardianship. In an accompanying opinion, the court held that, although Clemy may be deemed to have consented to the guardianships by not filing a timely objection, she retained the right to revoke that deemed consent and to receive notice of all further proceedings, including service of all pleadings. The court, at least tacitly, appeared to regard the failure of DSS to serve a copy of its motion for final order on Clemy as an irregularity under Md. Rule 2–535, thereby justifying a setting aside of the 21–month old judgments.

DSS promptly filed a motion to alter or amend that order as well as a request to stay its effect. The motion for stay was supported by a letter from Stephon's psychiatrist and pointed out that (1) Clemy had requested that the children be immediately returned to her, (2) unless the order was stayed, DSS's authority to continue the children in foster care would terminate, and (3) immediate return of the children would be detrimental to them.

The court initially stayed the December 5 order but ultimately denied the motion to alter or amend, and this appeal by DSS ensued. Whether the stay is still in effect is not entirely clear.

In an opinion issued on January 16, 1997, the Court of Appeals reversed the order vacating the guardianship, holding that a natural parent who fails to file a timely objection as directed in the show cause order is deemed to have consented to the adoption/guardianship and may not thereafter revoke the deemed consent. *In re Adoption/Guardianship No. 93321055/CAD*, 344 Md. at 486, 687 A.2d 681. As a consequence, the parent is not entitled to notice of any further adoption/guardianship proceedings. *Id.* The effect of this holding was to terminate Clemy P.'s parental rights with

respect to Alphonso and Stephon. In reaching its conclusion, the Court acknowledged in the form of a "caveat" that, in light of F.L. § 5–319, a question remained concerning delayed or disrupted adoptions as to whether the trial court was authorized to reinstate the rights of a natural parent, who had previously consented to adoption. *Id.* at 487–88, 687 A.2d 681.

Following the Court's holding, appellant, pursuant to F.L. § 5–319, filed a request for hearing based upon delay in adoption, noting that three years had passed since the final guardianship decree had been entered and the children had not been permanently placed. F.L. § 5–319 provides, in relevant part:

(b) Except as provided in subsection (g) of this section, a guardian with the right to consent to adoption, including a guardian with the right to consent to adoption who was appointed without the consent of the natural parents, shall file a written report with the court and give notice of the child's status to each natural parent of the child under the guardianship and to the child's court-appointed counsel if:

(1) a placement for adoption is not made within 9 months of the decree of guardianship;

(2) a placement for adoption is made within 9 months of the decree of guardianship, but there is a disrupted placement, and a new placement is not made within 120 days of the disrupted placement; or

(3) a final decree of adoption is not entered within 2 years after placement for adoption.

. . .

(f) On receipt of the guardian's report under subsection (b) of this section, and every 12 months thereafter, the court:

(1) shall hold a hearing to review the progress which has been made toward the child's adoption and to review whether the child's current placement and circumstances are in the child's best interest; and

(2) shall then take whatever action the court considers appropriate in the child's best interest.

On April 23, 1997, a status hearing was held and counsel appeared on behalf of appellant, DSS, and the minor children. Shirley Gorgo, an employee of the Montgomery County Department of Health and Human Services who had helped "finalize the children for adoption," was the only witness to testify. Ms. Gorgo testified that the delay in adoption was due to the illness of the prospective adoptive parent's mother, which forced the adoptive parent to move to Texas.[1] Gorgo further testified, however, that guardianship had been reinstated, that the boys had moved to Texas, and that procedures to finalize the adoption were almost complete. Gorgo also gave her recommendation that the prospective adoptive parent be allowed to adopt both children as planned.

The court permitted appellant to cross-examine Gorgo. After the conclusion of Gorgo's testimony, appellant's counsel informed the court that she was prepared to present witnesses and made the following proffer:

Ms. P., as she stated back in 1994, when she attempted to intervene prior to there being a status hearing held, has indicated that she is ready, available, and willing to care for her children.

We have as potential witnesses, we have Ms. Clemy P. We have the minor child, Nyshea. P. who was in the same home as the children—as her brother Stephon and Alpohso—who has since been returned to her mother's care and custody in a juvenile court case closed.

We have also Ms. P.'s last social worker, Ms. Molly Flynn, who was the social worker that previously handled the case until the case was severed because the two boys' cases were in the Circuit Court under termination of parental rights while the sister, Nyshea's case, remained over in the District Court under the Juvenile Court under similar proceeding.

---

1. Although there was no testimony on the subject, another obvious reason the adoption was delayed was the extensive litigation surrounding this case, which lasted several years.

We also have the maternal grandmother who at one time prior to, I think, the record reflects, prior to the boys being in foster care, have been [sic] their caretaker.

So, we have all these people that we would like to present as witnesses on 5–319, in the adoption statute regarding the best interest of the children.

The trial court refused appellant's request to testify or present witnesses at the hearing. The court concluded that although appellant, as a natural parent, was entitled to notice of the children's delayed or disrupted placement under F.L. § 5–319(b), she had no standing to participate in the children's status hearing because her parental rights with regard to both children had previously been terminated.

## DISCUSSION

### I.

Appellee first contends that, because appellant failed to make a sufficient proffer of the proposed testimony and how it was relevant to the children's status hearing, she failed to preserve the issues raised for our review. We do not agree. Although our holdings in *In re Adoption/Guardianship Nos. CAA92–10852 & CAA92–10853*, 103 Md.App. 1, 651 A.2d 891 (1994), and *Shpak v. Schertle*, 97 Md.App. 207, 629 A.2d 763, *cert. denied* 333 Md. 201, 634 A.2d 62 (1993), require proposed testimony to be accompanied by a specific proffer to preserve appellate review, we believe appellant satisfied this requirement in the present case.

At issue in the status hearing is the not-yet-adopted child's placement and best interest. Appellant's proffer of the proposed testimony specifically addressed these issues. Each of the proposed witnesses had some measure of contact and communication with Stephon and Alphonso. In addition, each proposed witness was able to provide testimony that would bear on the best interests of the children and on the mother's ability to satisfy those interests. Accordingly, we hold that

appellant's proffer was at least sufficient to preserve her claims for appellate review.

## II.

■ Appellant argues that she had a due process right under F.L. § 5–319 to participate in her sons' status hearing and that the trial court's refusal to allow her to testify and call witnesses at the hearing violated this right. In her words, "[n]otifying the parent of the child's status would be meaningless if the parent was put in a position of being a mere spectator at the hearing." In support of her argument, appellant cites the United States Supreme Court's holding in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), wherein the Court held that the failure to provide a welfare recipient an opportunity to be heard prior to cutting off welfare benefits violated due process. Appellant also relies on *In re Dependency of H.,* 71 Wash.App. 524, 859 P.2d 1258 (1993), in which the Washington State Court of Appeals found that due process required the court to provide a mother, facing the prospect of losing custody of her children, the opportunity to call witnesses at the preliminary shelter hearing.

We find the holdings of the cases cited by appellant to be inapplicable to the question in the case *sub judice.* *Goldberg* and *In re Dependency of H.,* involved, respectively, an individual's right to a hearing and an individual's right to participate in a hearing, in which then existing fundamental rights could be terminated. Such cases provide little insight into this case, however, wherein the fundamental right at issue, namely appellant's right to raise her children, had been terminated before the hearing was commenced. Appellant acknowledges that the effect of the Court's decision in *In re Adoption/Guardianship No. 93321055/CAD* was to terminate her parental rights, and she does not assert in these proceedings that the procedures, which resulted in the termination of her parental rights, violated her right to due process in any manner.

Notwithstanding the marginal relevance of the cases cited by appellant, we recognize the importance of determining the exact implications of F.L. § 5–319 on someone in appellant's situation, particularly in light of Judge Wilner's caveat in the earlier case. Thus, remaining faithful to the traditional principles of statutory interpretation, we examined the legislative development of the statute to ascertain the intent behind the notice and hearing requirements and to determine whether appellant was, indeed, entitled to participate more fully in the status hearing.

F.L. § 5–319 is a direct descendent of Article 16, § 75, which was originally codified by the General Assembly in 1982. Supporters of the legislation indicated that § 75 was intended, at least in part, to invoke some degree of parental re-involvement in guardianship cases in which a child's permanent placement was delayed or disrupted. The mandates of § 75 required the guardian to notify the natural parent of the child's status if the placement for adoption had not been made within 1 year from the entry of the guardianship decree, if the placement had been disrupted and a new placement was not made within 120 days of the disruption, or if the final decree of adoption had not been made within 3 years of the placement for adoption. The guardian was also required to submit to the court a report on the child's status, and the court was required to review the guardian's report. The section further provided:

> If the decree of guardianship does not include a waiver of the right to receive notification, the court shall hold a hearing, after notice to the parent at the last known address which the guardian has for the parent. Otherwise, the court may on its own motion hold a hearing.

In 1984, Article 16 was re-codified as Title 5 of the Family Law Article, and the former § 75 became current § 319. While the notice requirements concerning the child's adoption status remained substantively unchanged, the legislature added subsection (f), which modified provisions concerning the mandatory court hearing. The revised § 319(f) stated:

On receipt of the guardian's report on a delay in placement for adoption, the Court:

(1) shall review the report;

(2) unless both natural parents have waived notice in accordance with subsection (d) of this section, shall hold a hearing after each natural parent has been notified, at the last address known to the guardian, of the hearing.

In 1987, subsection (f) underwent a major revision and the current language was implemented:

(f) On receipt of the guardian's report under subsection (b) of this section, and every 12 months thereafter, the court:

(1) shall hold a hearing to review the progress which has been made toward the child's adoption and to review whether the child's current placement and circumstances are in the child's best interest; and

(2) shall then take whatever action the court considers appropriate in the child's best interest.

In this revision, the General Assembly specifically removed the requirement that the child's status hearing be held only after the natural parent was notified of the hearing. The Committee Report accompanying this revision explained the legislative intent behind the new provision:

The intent of this bill is to insure periodic circuit court review of agency efforts to achieve adoption or long-term placements of children in foster care.

After reviewing the language and history of F.L. § 5–319, we conclude that, if there ever was a time when the parent was entitled by right to participate in the mandatory status hearing, this right was revoked by the General Assembly when it revised subsection (f) in 1987. The language used and intent declared in that revision indicates clearly that the present role of the hearing is to evaluate the child's status, to determine the reasons for the delay in adoption, and to insure that procedures are implemented by the child's guardian to facilitate the appropriate long term care that is in the child's best interest.

■ Appellant contends that she is entitled to participate in the hearing because it is "her only remaining opportunity to argue for custody of her sons." While we acknowledge that some measure of parental re-involvement is to be found within F.L. § 5–319, the language and history of the statute do not indicate that the General Assembly guarantees natural parents participation in a mandatory status hearing. Rather, we find that the requirements of F.L. § 5–319 are analogous to the requirements of F.L. § 5–322, which mandates notice of adoption/guardianship proceedings to those parents who have previously signed a written consent to have their parental rights terminated. The notice requirement is merely a measure designed to alert the natural parent of the proceedings and does not create a corresponding right to participate in those proceedings. *In re Adoption/Guardianship No. 93321055/CAD*, 344 Md. at 485, 687 A.2d 681.

The caveat addressed by Judge Wilner in *In re Adoption/Guardianship No. 93321055/CAD, supra*, concerned the scope of circuit court authority under F.L. § 5–319(f)(2) and whether the court, under that section, could reinstate parental rights previously terminated. It remains unnecessary to address that issue in the context of this case, in which the only question is whether the natural parent whose parental rights have previously been terminated has a right to participate in the hearing mandated by the statute. It is sufficient to say that the notice requirement of F.L. § 5–319(f)(2) in no way reinstates or confers to natural parents a legal status previously terminated from which fundamental parental rights may arise. The status of the child's guardianship at this stage in the process is not in doubt: guardianship with the right to consent to adoption or other long term care is vested in DSS; the natural parent remains a legal stranger to the child.

The General Assembly has made clear that the right of a natural parent under F.L. § 5–319 is limited to notification of the child's status and does not extend the right to participate in the mandatory status hearing, which is intended to review agency efforts to place the child permanently and to implement measures to safeguard the child's best interests. The

evidence indicates those efforts, although temporarily frustrated by the circumstances, had resumed and were nearly completed. The children were living with their prospective adoptive parents in Texas. While we may think it prudent in determining the best interests of the child to hear and evaluate all relevant sources of evidence, we cannot say the court abused its discretion by refusing appellant the right to testify or present witnesses at the status hearing.[2] Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**2.** In the present case, the trial court did grant appellant a degree of participation in the status hearing by permitting her to cross-examine the only witness who testified, Shirley Gorgo. We note that the trial court has broad discretion over the conduct of these proceedings, and our holding in this case does not operate to limit this role in any manner.