706 A.2d 144

In re ADOPTION/GUARDIANSHIP NO. 94339058/CAD IN the CIRCUIT COURT FOR BALTIMORE CITY.

No. 492, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Feb. 27, 1998.

Joy L. Phillips, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shelly E. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellee Dept. of Social Services. Lynn Johnson, Baltimore, on the brief, for minor children.

Argued before HOLLANDER and SALMON, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

In December 1994, the Baltimore City Department of Social Services ("the Department"), appellee, filed a petition in the Circuit Court for Baltimore City seeking to terminate the parental rights of Mark M., appellant, and Sonya B. as to their sons, Marques M. and Marcus M., and for guardianship with the right to consent to adoption or long-term care short of adoption. Sonya B., is not a party to the appeal. After a two-day hearing held in May 1996, the court (Strausberg, J.) granted the petition. Appellant has timely noted his appeal and presents the following questions for our review, which we have rephrased slightly and reordered:

I.   Did the trial court err in failing to make specific findings of fact?

II.  Did the record as a whole justify the extreme sanction of termination of parental rights?

For the reasons that follow, we shall affirm. In doing so, however, we recognize that this is a close case. Therefore, we shall set forth a rather detailed summary of the facts.

### Factual Background

Sonya B. and appellant are the parents of Marques, born on March 8, 1989, and Marcus, born on April 4, 1990. In addition to Marques and Marcus, appellant and Sonya B. had two other children: Mark M., born January 8, 1988, and Tykia B., born October 7, 1986. On February 21, 1996, appellee amended its petition to include the termination of parental rights of appellant and Sonya B. with regard to Mark M. and Tykia B. Appellant has consented to the petition as to Mark M. and Tykia B.

Appellant was born in 1972, and Sonya B. was born in 1969. Although the record is unclear, it appears that appellant and Sonya B. were never married. In any event, in late 1989, after Marques was born and while Sonya B. was pregnant

with Marcus, appellant and Sonya separated. Sonya B. became the primary custodian of the couple's four children.

Appellant has been incarcerated for a substantial portion of Marques's and Marcus's lifetimes. He has an extensive criminal record, much of which is associated with narcotics. Appellant admitted to the following: (1) he was arrested in January 1989—two months before Marques was born—on drug possession charges, which were stetted; (2) he was arrested in August 1989 on charges of drug possession and gambling, which were stetted; (3) in January 1990—three months before Marcus was born—appellant was arrested on charges of robbery with a deadly weapon and using a handgun during the commission of a crime, both of which were stetted; (4) in August and September 1990, he was charged with possession of narcotics with intent to distribute, and the charges were also stetted; (5) in October 1992, appellant was charged with possession with intent to distribute and assault, for which he was convicted and sentenced to a term of incarceration of four years. Appellant testified that he also "received an additional year and seven months," but the offense that resulted in this additional term is unclear from the record. Appellant's incarceration began in October 1992; he was released on parole in December 1995.

The Department's records were introduced into evidence. The records indicate that, shortly after the couple separated in 1989, Protective Services reported that the children had poor nutrition, did not receive immunizations, and lived in inadequate housing. Protective Services also raised concerns about Sonya B.'s mental health. The Department paid for several items, such as furniture and groceries, and provided housing for the mother and assisted in paying her electric bill. The Department's records also reveal that, in April 1990, the Department contacted appellant, who reported that he purchased food for the children. According to the Department's witness, case worker Adrian Dean, appellant told the Department that he would encourage Sonya B. "to get immunizations for the children, look for a larger apartment, supply milk and Pampers, assist with child care and supervision, and encour-

age [Sonya B.] to attend counseling sessions from Mental Health."

Further, the Department's records reflect that an Intensive Family Services ("IFS") worker contacted appellant in May 1990 and informed him of the continued need for the children to obtain their immunizations. The IFS worker also discussed relocating Sonya B. to Section 8 housing. Dean testified that the records indicated that appellant said he was working with Sonya B. to set priorities with regard to spending her AFDC check, and he agreed to assist the IFS worker in getting Sonya B.'s rent and electric bills paid. He also said he would provide financial and emotional support to the family. At the same time, however, appellant said he could not find employment because he was unable to obtain his birth certificate and Social Security card. If and when he found a job, however, appellant expressed the desire to have child support taken out of his salary. Appellant also said he believed that Sonya B. was providing good care to the children.[1]

The Department's records between July 1990 and August 1990 indicate that Sonya B. did not make her rent payment and could not show where she spent her AFDC check. Moreover, the Department determined that the children continued to lack proper medical care and that Sonya B. had neglected her children. Sonya B. also alleged that there had been a lack of support by appellant. Sonya B.'s sister, Darlene B., who at the time of the hearing had custody of appellant's older children, Mark M. and Tykia B., testified that, during 1990 and 1991, appellant "would make sure the kids had Pampers, milk, and whatever."

In October 1992, appellant was incarcerated after his conviction for possession of a controlled dangerous substance with intent to distribute and assault. In April 1993, while appellant remained incarcerated, Sonya B. abandoned her children, who were then placed in shelter care. On May 3, 1993, while

---

1. At the termination hearing, appellant denied having conversations with social services workers about the children's needs.

appellant was incarcerated, the children were adjudicated Children In Need of Assistance ("CINA") and committed to the care of the Department. It is unclear whether appellant attended the CINA hearing. In August 1993, a review hearing was held, at which Marques and Marcus were formally committed to the Department for placement in their current foster home. Appellant attended the hearing and stipulated to the placement of Marques and Marcus in foster care. According to the Department's records, appellant expressed concern about visits and correspondence with his children. He also said that he would like to write to his children, and he provided his address at the House of Correction to the case worker.

On December 17, 1993, the Department sent a letter to appellant notifying him that his children had been in foster care "for some time now." According to Dean, the letter informed appellant that "he needs to contact the foster care worker to plan for . . . his children and that there's a time period. It says [the Department] needed the names and numbers of the family members that might be interested in the children for placement." The letter also stated that, if no plan is made, the agency would proceed with other plans, including adoption. Dean testified that, after this letter was sent, there was no contact with appellant until the Department sent him a letter in September 1994 explaining that a "show cause hearing" had been held in which the Department had decided to pursue termination of parental rights and to plan for the adoption of the children. Other Department records indicate that the Department accepted the permanency plan of adoption for Marques and Marcus in May 1994, but that there was not enough information about appellant at the show cause hearing in September 1994, and that it was rescheduled for November 2, 1994.

On September 13, 1994, the Department's records indicate that appellant called in response to the Department's letter and said he would not consent to the termination of his parental rights. Three days later, a case worker visited appellant in prison, and appellant said he "very much desires

reunification with his children." The Department's records reflect that appellant indicated he believed he had made significant changes in his life: he obtained his GED while incarcerated; took a college course; attends counseling twice a week; and works as a clerk. The case worker explained the show cause process to appellant, along with the need for appellant to "show some efforts if he wanted to get his children back." On September 20, 1994, the Department received "a very articulate" letter from appellant. The case worker's entry in the Department's records indicated that appellant again said that he wanted to reunify with his children and planned to do so. At the termination hearing, Dean testified about a letter from appellant to the Department dated September 16, 1994.[2] In it, appellant stated: "My children have always been the most important thing in my life." The letter also indicated appellant's regret for "[t]he road I took to have myself removed from their lives."

In December 1994, the Department arranged for the children to visit appellant in prison. It was the first time appellant had seen his children in more than two years. According to the Department's records, the children "seemed glad to see their father and he was especially pleased to see them." The case worker's notes also indicated that the children "seemed to know [appellant] but they didn't appear greatly bonded to him."

According to the Department's records, appellant called the Department in January, March, May, and October of 1995 to ask about the children. In two of these calls, appellant said he opposed the Department's decision to terminate his parental rights. During the October call, appellant asked if he could visit with his children. The Department then arranged for two visits at the prison prior to appellant's release on December 15, 1995. As to the visit in November 1995, Dean testified

---

2. It is unclear whether the letter dated September 16, 1994, and the letter described in the Department's records, dated September 20, 1994, are one and the same.

that the children "seemed a little sad at the end of the visit, a little confused."

After his release from prison on December 15, 1995, appellant maintained monthly, one-hour visits with his children at the Department. Dean testified that, during these visits, which also served as a sibling visit involving all four children, the children were happy to see appellant and they interacted openly.

Nevertheless, after appellant's release from prison, the Department did not offer reunification services to appellant. Dean testified that, because the Department's plan was not to return the children to appellant, she was limited in what services she could offer to him. On February 29, 1996, however, the Department offered a service agreement to appellant. According to Dean, appellant refused to sign the agreement because it included a provision that he enroll in drug counseling. On March 12, 1996, the Department offered a second, six-month service agreement to appellant that omitted the drug counseling provision. Appellant accepted this agreement. The only specific service provided under the agreement, however, was to "[r]efer [appellant] and/or assist him in locating adequate housing." Dean testified that she contacted the housing department and asked about the application process. She then wrote a letter to appellant informing him that he had to apply in person for housing assistance. The letter also included information as to where and when he should apply.

Under the service agreement, appellant agreed to "obtain stable housing" and to present the Department with a plan of how he will make financial provisions to support his children. Dean testified that she did not refer appellant to employment counseling because appellant told her he had completed his GED and was searching for a job. She did, however, suggest that appellant visit the unemployment office and look at the want ads in the newspaper. Further, Dean said that she did not refer appellant for public assistance because the children were not in appellant's care.

Dean then explained the significance of the service agreement, in light of the Department's decision to proceed with adoption:

[APPELLANT'S COUNSEL]: Why did you enter into a reunification service agreement with [appellant]?

[DEAN]: We entered into the agreement so that [appellant] would have an opportunity to show in court today his seriousness about getting his children back in his care. However, I specified in the agreement that our plan was still adoption and that this was basically—a decision to change that plan would be made today because—

[APPELLANT'S COUNSEL]: Do you think [appellant] is serious about having his children returned to him?

[DEAN]: I do not know.

[APPELLANT'S COUNSEL]: You've had an opportunity to have discussions with [appellant] since you were involved in the case and you've worked with other children and other families. In your opinion, is he serious? Is there some kind of genuineness there?

[CHILDREN'S COUNSEL]: Objection.

THE COURT: Overruled.

[DEAN]: I don't know if he is serious about having his children returned to him and understanding exactly what it means to take care of small children, as I don't know if he ever has with these particular children.

Appellant testified that, around the time he and Sonya B. became separated, he had obtained work through a temporary agency, but that he had earned no more than $30 per day. He acknowledged that he had overslept for work as many as five days per month. Appellant also admitted that, in 1990, he had been "deeply involved in selling drugs."

In addition, appellant stated that he applied for eight jobs since his release from prison, three within two weeks of the evidentiary hearing in this case. Among the jobs was that of a truck driver, although appellant admitted that he did not possess, and had not applied for, a driver's license. Finding

employment was also a condition of appellant's parole. Until he obtained employment, appellant said that he would apply for public assistance. Appellant also testified that he applied for public housing within a week prior to the termination hearing, and he priced rental housing in Northeast Baltimore. At the time of the hearing on May 22 and 23, 1996, appellant lived with his sister in Baltimore.

At the close of the hearing, the trial court concluded that there was clear and convincing evidence to support the Department's petitions to terminate appellant's parental rights. In announcing its decision, the court also considered the position of court-appointed counsel for Marques and Marcus, who supported the Department's position.

On November 17, 1997, in response to a motion filed by the Department, we issued an Order remanding the case to the circuit court for specific findings of fact, in light of our opinion in *In re Adoption/Guardianship No. 95195062/CAD,* 116 Md. App. 443, 696 A.2d 1102 (1997). On December 15, 1997, the circuit court held a hearing and issued a supplemental memorandum, affirming its earlier decision to terminate appellant's parental rights. In our order, we permitted the parties to submit memoranda to address the court's supplemental opinion.

We will include additional facts in our discussion.

## Discussion

### A.

Maryland courts and the Supreme Court of the United States have long recognized the fundamental right of a parent to raise his or her child. *Santosky v. Kramer,* 455 U.S. 745, 759, 102 S.Ct. 1388, 1397–98, 71 L.Ed.2d 599 (1982); *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112–13, 642 A.2d 201 (1994); *see also In re Adoption/Guardianship No. 95195062,* 116 Md.App. at 454, 696 A.2d 1102. In *Walker v. Gardner,* 221 Md. 280, 157 A.2d 273 (1960), the Court of Appeals explained:

[A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

*Id.* at 284, 157 A.2d 273.

Nevertheless, the best interest of the child is paramount. *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 323–24, 701 A.2d 110 (1997); *In re Adoption/Guardianship No. 10941,* 335 Md. at 113, 642 A.2d 201. Accordingly, Md.Code (1984, 1991 Repl.Vol., 1997 Cum.Supp.), § 5–313(a) of the Family Law Article ("F.L.") provides: "A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent [only] . . . if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to th[at] child. . . ."

■■■■ The burden of proof required by the clear and convincing evidence standard is "greater than the usually imposed burden of proof by a fair preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." *Berkey v. Delia,* 287 Md. 302, 318, 413 A.2d 170 (1980) (quoting *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 871, 330 N.E.2d 161 (1975)); *see also 1986 Mercedes Benz v. State,* 334 Md. 264, 283, 638 A.2d 1164 (1994). The evidence " 'should be "clear" in the sense that it is certain, plain to the understanding, and unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause [one] to believe it.' " *Wills v. State,* 329 Md. 370, 374 n. 1, 620 A.2d 295 (1993) (alteration in original) (quoting *Maryland Civil Pattern Jury Instructions* 1:8b (1984)).

In order to determine what is in a child's "best interest," the trial court must analyze and consider the criteria outlined in

F.L. § 5–313. In the case of *In re Adoption/Guardianship No. 87A262*, 323 Md. 12, 590 A.2d 165 (1991), the Court recognized the importance of specific consideration by the trial court of all the statutory factors. It said: "In cases where parental rights are terminated, it is important that each factor be addressed specifically not only to demonstrate that all factors were considered but also to provide a record for review of this drastic measure." *Id.* at 19–20, 590 A.2d 165; *see also In re Adoption/Guardianship No. 95195062*, 116 Md.App. at 457–61, 696 A.2d 1102. F.L. § 5–313(c) provides:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

The trial court also must address the provisions of F.L. § 5–313(d) when, as here, the child has previously been adjudicated CINA. In particular, § 5–313(d) requires the court to determine whether:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or

neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able. . . .

This section is satisfied if any one of these conditions exists. *In re Adoption No. 09598,* 77 Md.App. 511, 526, 551 A.2d 143 (1989); *see also In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853,* 103 Md.App. 1, 28–29, 651 A.2d 891 (1994).

■ On review, we must ascertain whether the trial court considered the statutory criteria, whether its factual determinations were clearly erroneous, whether the court properly applied the law, and whether it abused its discretion in making its determination. *See In re Adoption/Guardianship No. 3598*, 347 Md. at 311, 701 A.2d 110. What the Court said in *In re Adoption No. 09598*, is pertinent here.

[O]ur function, in reviewing [the trial court's] findings, is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the [trial court's] determination that it would be in the best interest of [the child] to terminate the parental rights of his natural father.

77 Md.App. at 518, 551 A.2d 143; *see also In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A*, 100 Md.App. 262, 270, 641 A.2d 889 (1994).

## B.

First, we must consider whether the trial court sufficiently complied with our order of November 13, 1997, instructing the court to supplement the record with "a statement from the circuit court setting forth the court's ruling with respect to each statutory factor upon which each underlying petition is based." In response to our order, the trial court held a hearing on December 15, 1997, and issued a supplemental memorandum. The supplemental memorandum sets forth F.L. § 5–313(c) and (d) and discusses each element of the statutory criteria as they apply to Marcus and Marques. We are satisfied that the trial court made sufficient findings of fact as to the specific statutory criteria.

## C.

■ Appellant contends that appellee did not meet its burden of satisfying the statutory criteria by clear and convincing evidence. In particular, appellant argues that reversal is warranted because appellee never offered reunification ser-

vices to appellant and, to the extent any services were offered, appellee's decision to pursue termination of appellant's parental rights was premature. We disagree. In deciding to terminate appellant's parental rights, the record makes clear that the trial court carefully reviewed the factors codified in . F.L. § 5–313(c) and (d), along with the evidence. The trial court's findings are not clearly erroneous.

F.L. § 5–313(c)(1) requires consideration of the "timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent." Appellant complains that the Department never offered services to him in an attempt to reunite him with his children and, to the extent that services were offered, they were inadequate. Moreover, appellant argues that there was no showing by appellee that reunification services would be futile.

Appellant likens this case to *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853*, 103 Md.App. at 1, 651 A.2d 891, in which we reversed the termination of the appellant's parental rights because, *inter alia*, we concluded that "the services offered to [appellant] and the efforts made by [the Department in Prince George's County] to attempt to reunite [appellant] with his sons f[e]ll short of what is required under applicable law." *Id.* at 18, 651 A.2d 891. That case is readily distinguishable from the case *sub judice*.

In *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853*, the appellant and his teenaged wife attended a CINA hearing on December 3, 1991 regarding their twin sons, who were then two months old. The hearing was rescheduled but, as the parties left, the social worker assigned to the case "spoke with [the children's parents] about their plans for the children and discussed with them what services [the Department in Prince George's County] could offer." *Id.* at 7–8, 651 A.2d 891. Just nine days later, the Department changed its permanency plan for the infants from reunification to adoption. Between December 3, 1991 and September 1992, the Department communicated only with the mother regarding

the children. The Department later sent letters to appellant at scattered addresses, and there was a missed phone contact, but there was no communication between appellant and the Department. Indeed, the social worker's conversation with the parents on December 3 was the *only* contact that the Department had with appellant until trial. At trial, the appellant testified that, although he believed he was capable of caring for his children, he would "readily accept any services" the Department could provide. 103 Md.App. at 27, 651 A.2d 891.

Unlike *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853*, this is not a case in which the Department changed a permanency plan from reunification to adoption within a matter of days, or when the children were just infants. To be sure, most of the Department's efforts were focused on Sonya B. But the evidence clearly demonstrates that the Department directly contacted and engaged appellant throughout this process, and he vowed to assist Sonya B. with the children, although he told the Department that he thought Sonya B. was providing good care for the children.

Appellant contends that these were not reunification services, because the children were not removed from Sonya B. until May 1993. Moreover, appellant argues that whatever services were offered, the trial court erred in finding that they were offered in an attempt to reunite appellant with his children.

In August 1993, while appellant was incarcerated, he stipulated to the placement of Marques and Marcus in foster care. As we noted, in December 1993, the Department sent a letter informing appellant that he needed to contact the Department to plan for his children, but appellant never responded. Although appellant testified at the termination hearing that he did not have a copy of the letter, there was no indication that it was sent to an incorrect address. Indeed, appellant provided his address at the House of Correction to the Department in September 1993. *Cf. In re Adoption/Guardianship Nos.*

*CAA92–10852 and CAA92–10853,* 103 Md.App. at 14–18, 651 A.2d 891.

It was not until September 1994, when the Department sent a letter to appellant indicating that its plan had changed to adoption, that appellant contacted the Department. After receiving a letter and a phone call from appellant, a social worker visited appellant at the House of Correction in Jessup. With the exception of his remarks to the case worker at the foster care placement hearing in September 1993, this was the first time since his incarceration in October 1992 that appellant expressed an interest in seeing his children. The testimony and the Department's records indicated that the social worker arranged for and took appellant's children to visit him in prison in December 1994.

Further, although the Department's plan remained for adoption when it offered the two service agreements to appellant, Dean testified that there was a chance that she might have recommended changing the plan from adoption to reunification if appellant obtained housing and employment. The following colloquy is relevant:

[CHILDREN'S COUNSEL]: What would you have done if [appellant] had presented you with verification of employment and he had secured independent housing?

[DEAN]: If he would have done those things, I suppose I would have went to my supervisor and talked to her about our plan and possibly changing it. Had those things been done—

Q: Why would—I'm sorry. Go ahead.

A: Had those things been done, then I would have had reason to believe that he was committed to our plan—his plan to return the children to him.

Q: So, to this point, the progress under this Family Service Plan is indicative that he is not serious?

A: Yes.

Q: Okay. When you say you would have gone to your supervisor about a change in the plan, what specifically would you have reported?

A:   I would have discussed with my supervisor the possibility of changing the plan from adoption to returning to the parent and working more with the parent.

Certainly, the Department could have done more to refer appellant for services.   On the other hand, the Department may well have thought that a person who wants to gain custody of a child ought to show some initiative.   Appellant's failure to contact the Department for an entire year after Marques and Marcus were placed in foster care cannot be said to be anything other than a palpable lack of initiative, particularly in light of the Department's letter of December 1993 asking appellant to assist in a plan for his children.   Limited as the Department's effort was, it is distinguishable from the complete lack of services offered to the father in *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853.*   Therefore, we conclude that the services offered by the Department were properly considered as services offered "*to facilitate reunion*" of appellant and his children.

■   Even if the Department failed at providing adequate referral services to appellant, reversal is not necessarily warranted.   F.L. § 5–313(c) does not require a trial court to weigh any one statutory factor above all others.   Rather, the court must review all relevant factors and consider them together.   *In re Adoption No. 2428,* 81 Md.App. 133, 139 n. 1, 567 A.2d 139 (1989), *cert. denied,* 318 Md. 683, 569 A.2d 1242 (1990).   On balance, there is ample evidence in the record to uphold the trial court's finding that it was in the children's best interests to terminate appellant's parental rights.

F.L. § 5–313(c)(2) requires the court to consider "any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement."   As we stated previously, appellant accepted a service agreement in March 1996, in which the Department agreed to provide a housing referral and appellant agreed to find housing and employment and to maintain visits with his children.   Appellant asserts that there is "no mention in the transcript of any action taken

by the Department at all" regarding the Department's fulfilling the service agreement. Dean expressly stated that she contacted the Housing Department and wrote a letter instructing appellant when and where to apply. For his part, appellant did maintain monthly visits with his children, but he did not secure either employment or housing.

Appellant further argues that, although he agreed to find housing and employment within six months, the Department scheduled the termination hearing within only two months of signing the agreement. Appellant analogizes this case to *In re: Adoption/Guardianship No. 87A262*, 323 Md. at 12, 590 A.2d 165, in which the Court of Appeals affirmed the trial court's denial of the Department's petition to terminate parental rights.

There, after an investigation into alleged sexual abuse of a three-year-old girl, the child was adjudicated CINA and placed in foster care. The Department developed a reunification plan, which included supervised, bi-weekly visits with the child, and required the parents to attend psychiatric counseling and other treatment programs. After new allegations arose concerning prior sexual abuse of the child and "inappropriate" remarks made by the parents during visitation, the Department's request to terminate visitation was granted. Three months later, the Department changed its plan from reunification to adoption because the child's placement in foster care had continued for more than eighteen months and because the Department believed that the parents made only minimal efforts to engage in court-ordered treatment. 323 Md. at 15–16, 590 A.2d 165. In affirming the trial court's denial of the Department's petition, the Court of Appeals observed that, although the parents had not fully cooperated with the Department, they made efforts at treatment. The Court also observed that there was evidence that the parents' failure fully to comply with the unification plan were due to circumstances beyond their control, such as the mother's complications from two pregnancies, her need to care for a high risk infant, and the father's inability to schedule regular

treatment because of his shift-work schedule. *Id.* at 22–23, 590 A.2d 165.

Unlike *In re Adoption/Guardianship No. 87A262,* appellant's problems were largely of his own making. In its previous dealings with appellant, during intensive efforts to assist Sonya B., the Department engaged appellant to assist in its efforts. Despite appellant's promises, he did nothing to assist with ensuring that his children received proper immunization and did not assist with Sonya B.'s rent or electric bills. Indeed, appellant admitted that he had been deeply involved in the drug trade, and had been arrested on drug offenses while Marques was an infant and while Sonya B. was pregnant with Marcus.

Although appellant contends that the Department did not give him enough time to fulfill the terms of the service agreement, the evidence clearly supports the trial court's finding that appellant partially complied with the terms of the agreement by visiting his children, but he "failed to show demonstrable signs of effort in finding adequate housing and/or a job." Upon his release from prison in late 1995, for example, appellant applied for eight jobs over a span of five months. Finding a job within six months of his release from prison was a condition of appellant's parole. Appellant testified:

> Well, they stipulate that you will have to obtain employment within six months, but it depends on your parole officer. If you present to him applications and places that you went and names and dates and whatever, he would—
>
> It depends on the parole officer. If he know you're looking, if he believe that you are looking, he wouldn't put a whole lot of unnecessary pressure on you. If he believe that you are looking and knowing that you are an ex-con, then he would bear with you.

Moreover, three of appellant's job applications were made within the two weeks prior to the termination hearing. As we noted, one of the jobs was that of a truck driver, for which appellant did not even possess a driver's license. Appellant

testified that he "applied anyway just for the record." He further testified that he did not visit the unemployment office, nor did he visit any temporary job placement agencies. We recognize that appellant's criminal background may have been a factor in his inability to secure employment within five months after his release, but this certainly was a circumstance of his own making, for which the children should not be penalized. Moreover, beyond filing an application for public housing five days before the trial court hearing, appellant said that his housing search consisted of "just pricing" rental housing in Northeast Baltimore.

Under F.L. § 5–313(c)(3), the court must also consider "the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest." The trial court recognized that there was evidence the children react "appropriately" to their father. Moreover, Dean testified that the children seemed "happy" as the visits progressed.

On the other hand, with respect to F.L. § 5–313(c)(4), appellant concedes, as he must, that the children have adjusted well to their foster family, with whom they have resided since September 1993. Moreover, Dean testified that the children call their foster parents "mommy" and "daddy."

The record also indicates that Marques and Marcus have made great strides since entering their foster home. When Marques initially entered foster care, he suffered from language delays, attention problems, depressive disorder, receptive language disorder, and a developmental coordination disorder. At the time of the termination hearing, Marques enjoyed an "A" average in elementary school. Similarly, Marcus entered foster care suffering from low cognitive development, delayed language skills, separation anxiety, language disorder, and developmental coordination disorder. At the time of trial, Marcus had successfully completed a Headstart program.

Concerning F.L. § 5–313(c)(5), the trial court found that appellant failed to "accommodate his living standards, behav-

ior, habits, customs, work schedule, and general circumstances to make it in the best interests of his children to be returned to his side." In considering factors (c)(5)(i) through (c)(5)(iii),[3] the court observed that, although appellant maintained contact with his children, he also neglected his children prior to and while receiving the Department's support. Appellant argues that the record does not support this finding. Instead, appellant contends that he has made progress, as evidenced by his obtaining his GED, taking parenting classes, and weaning himself from drugs while incarcerated. Notwithstanding appellant's progress, the trial court observed:

> [T]here is not one scintilla of evidence showing whether [appellant] ever used any of the above skills to benefit or reunite with Marcus or Marques M. To the contrary, the wealth of evidence shows [appellant] neglected contacting and/or tending to his children's needs for years, failed to find a job and housing, and reneged contracting for services with the Department. There is neither evidence further counseling or financial support will enable [appellant] to reunite with or benefit his children.

As noted, Dean explained that appellant failed to follow through on his promises to assist Sonya B. during the Department's intensive efforts to help her with the children. Moreover, Dean testified that during much of appellant's incarceration he did not attempt to contact the children, did not send cards, letters, or gifts to Marques or Marcus, and did not respond to the Department's letter of December 1993 requesting his help in planning for the children's future. The only evidence of any interest in his children came at the foster care placement hearing in September 1993, when appellant expressed an interest in visiting with and writing to his children. Yet appellant did nothing to follow up on his expressions of concern until the Department informed him that it sought to terminate his parental rights.

---

3. F.L. § 5–313(c)(5)(iv) is not applicable because the children had been in foster care for more than 18 months.

After his release from prison in 1995, appellant refused to accept drug counseling as part of any service agreement. When asked if she thought appellant needed drug counseling, Dean testified: "[I]t was an issue, as he was incarcerated for several years; and because of that, he missed time with his children. Had drugs not been an issue, then he wouldn't have been away from his children for two years." Notwithstanding appellant's insistence that he no longer used drugs and that he had joined Narcotics Anonymous in prison, appellant's refusal to accept drug counseling following his release supported the court's finding that appellant failed to accommodate his behavior to make it in the best interests of Marques and Marcus to be returned to him. The court's finding is further supported by appellant's minimal efforts to find employment and housing, as we described earlier.

We believe the evidence before the trial court supported its finding that, despite whatever progress appellant made while incarcerated, upon his release, he did not use his skills "to benefit or reunite with Marcus or Marques." In addition, the trial court was entitled to find that because there was no evidence indicating that appellant was ever lawfully employed or had a lawful alternative source of income or benefits, he was unable to support Marques or Marcus.

F.L. § 5–313(c)(6) requires consideration of "all services offered to the natural parent before the placement of the child." The court found that appellant "received several offers of services geared to aid him and his family, which offers and aid produced no benefit to the children due to his neglect." This finding is clearly supported by the intensive efforts offered by the Department to appellant and Sonya B., the Department's efforts to engage appellant to assist Sonya B. in caring for their children, and appellant's failure to assist Sonya B., despite his promises to do so.

The trial court also evaluated the services provided to appellant after Marques and Marcus were placed in foster care. We agree with appellant that consideration of services after placement is in error. Nevertheless, the court's finding

is amply supported by the services provided *before* placement of Marques and Marcus in foster care.

The court also considered, as it was required to do, the factors contained in F.L. § 5–313(d). In particular, the court found that there was no evidence showing whether appellant suffered from a disability, but the court observed that there was evidence "suggesting [appellant] suffered from drug addiction, and/or is currently unable to find employment because of oversleep." Although appellant criticizes the court's observations, it is clear that the court did not find that appellant suffered from a disability.

The court considered F.L. § 5–313(d)(ii) and (iii) together, and concluded that there was "ample evidence showing [appellant's] behavior and care for his children fell well below any reasonable standard of custodial/parental care." Specifically, the court found that appellant: (1) failed to provide his children with a clean, safe environment, (2) failed to provide the children medical attention, food, or clothing, (3) failed to provide financial support to the family unit, and (4) failed to conduct parental duties concerning the children's education, social development, and general growth.

With regard the court's finding of neglect, appellant points out that, prior to his incarceration, the children were either in the custody of their mother or in foster care. Moreover, he argues that he cannot be said to have neglected his children during his incarceration. Appellant is wrong. Appellant's failure to assist Sonya B. after their separation, despite his promises to do so, clearly demonstrates his neglect. Nor does appellant cite any authority for the proposition that the trial court must ignore such palpable neglect when a parent is engaged by the Department to assist his family. Moreover, we note that from the time appellant was incarcerated in October 1992 until September 1994, when the Department informed him that it intended to seek termination of his parental rights, appellant's only expression of any interest in Marques and Marcus came at the foster care placement hearing in September 1993. Indeed, he ignored the Depart-

ment's letter of December 1993, informing him to contact the Department to help plan for the care of his children. It was not until the Department decided to proceed with adoption for Marques and Marcus—following years of appellant's neglect— that appellant decided to assert his parental rights. The court's finding of neglect is not clearly erroneous.

Regarding the court's finding that appellant failed to provide adequate food, clothing, shelter, and education, appellant contends that the court "placed the entire onus on the father and relieved the Department of any duty to actively and in good faith work with the father by providing him meaningful services in an attempt to reunite the father with his children." It is clear that appellant did not provide food, clothing, shelter, or education to his children. Notwithstanding appellant's assertions, the trial court acknowledged that appellant had made some efforts to join his children's lives.

### Conclusion

Appellant's efforts were too little and too late. The trial court was not required to ignore appellant's actions before he was incarcerated, nor was it required to view appellant's post-release behavior in isolation. Based upon our review of the record, we are satisfied that appellee met its burden of proving, by clear and convincing evidence, that termination of appellant's parental rights is in the best interests of Marques M. and Marcus M. Accordingly, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**